**SPRINGFIELD SCHOOL COMMITTEE et al., Defendants, Appellants,**

**v.**

**Abraham BARKSDALE, Jr., et al., Plaintiffs, Appellees.**

**No. 6481.**

United States Court of Appeals
First Circuit.
July 12, 1965.

James L. Allen, City Sol., with whom John J. O'Connor, Associate City Sol., Springfield, Mass., was on brief, for appellants.

Robert L. Carter, New York City, with whom Joan Franklin, Barbara A. Morris, New York City, Henry Weissman, Springfield, Mass., Anne Feldman, and Lewis M. Steel, New York City, were on brief, for appellees.

Reuben Goodman, Edward J. Barshak, and Stephen Morse, Boston, Mass., on brief of American Jewish Congress, Catholic Interracial Council, Episcopal Society for Cultural and Racial Unity, Civil Liberties Union of Massachusetts, and Jewish Community Council of Metropolitan Boston, amici curiae.

Edward W. Brooke, Atty. Gen., and Raymond H. Young, Special Asst. Atty. Gen., on brief of Massachusetts Commission Against Discrimination, amicus curiae.

Before ALDRICH, Chief Judge, BREITENSTEIN[*], Circuit Judge, and GIGNOUX, District Judge.

ALDRICH, Chief Judge.

This is a class action brought on behalf of Negro children requesting the United States District Court to eliminate what has sometimes come to be called de facto segregation [1] in the elementary and junior high schools in Springfield, Massachusetts. The defendants are the Springfield School Committee, its members, and its Superintendent of Schools. The district court held hearings in Springfield, and after considering the evidence made a number of findings and entered an interlocutory order against the defendants. Because of the importance of the question an appeal was sought and permitted pursuant to 28 U.S.C. § 1292(b).

We may say at the outset that while defendants contend that some of the court's factual findings are unwarranted, and plaintiffs, on the other hand, appear to believe they can rely upon evidence and inferences which the court did not accept, we disagree with both. We take the court's findings as they are. The question is whether these findings warrant any relief.

Briefly, since the latter part of the 18th century schools in the City of Springfield have been run on the neighborhood plan.[2] District lines are drawn, exclusively, the court found, "with reference to the location and capacity of the various schools and take into account the safety and convenience of the children in going to and from school." Exceptions are permitted to a few pupils. These, too, in purpose and in administration, are unrelated to any questions of racial or other special characteristics of the neighborhood group. Because of concentrated Negro housing in parts of the city, "rigid adherence to the neighborhood plan" causes racial imbalance, which the court specifically refused to "define" but accepted in the light of Springfield's racial composition as being "tantamount to segregation" when there is "a non-white attendance of appreciably more than fifty per cent." Disregarding Puerto Ricans, the court found such imbalance in five of the thirty-eight elementary schools, and in one out of eight junior high schools. For the year 1963–64 the total elementary school enrollment was slightly over 80% white, 17% Negro, and 2% Puerto Rican. Two

---

[*] Sitting by designation.

1. For various definitions of the term de facto segregation see Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564, 565–6, 584 (1965).

2. The Superintendent of Schools defined the neighborhood concept as aiming at the provision of "a school within a relatively safe walking distance of the child's home." The size of several elementary school districts has made bussing necessary, however, even though the standard for bussing is one and one half miles up to the third grade, and two miles through the sixth.

of the elmentary schools had over 80% Negro pupils. Fourteen elementary schools had none, or less than one per cent.

The court found that the imbalanced schools consistently ranked lowest in certain achievement ratings, and that few and sometimes no Negroes participated in special programs for students with a high achievement level. It did not, and probably could not, see Fiss, note 1, supra, at 569, Kaplan, Segregation Litigation and the Schools—Part II: The General Northern Problem, 58 NW.U.L.Rev. 157, 175, 202, (1963), find that this was not due at least in part to socio-economic conditions in the neighborhoods from which these schools drew, but on ample evidence it found that,

> "racially imbalanced schools are not conducive to learning, that is, to retention, performance, and the development of creativity. Racial concentration in his school communicates to the negro child that he is different and is expected to be different from white children. Therefore, even if all schools are equal in physical plant, facilities, and ability and number of teachers, and even if academic achievement were at the same level at all schools, the opportunity of negro children in racially concentrated schools to obtain equal educational opportunities is impaired. * * * " 3

The ultimate question, according to the court, is not whether there is a "constitutional mandate to remedy racial imbalance * * * [as such, but] is whether there is a constitutional duty to provide equal educational opportunities for all children within the system."

The court held there is such a duty and concluded that because of "the inadequacy of segregated education" this duty had not been performed. "[T]here must be no segregated schools."

Before considering the order the court felt to be warranted we mentioned briefly an area in which it made no findings. There was no finding that any reduction, let alone elimination, of imbalance could be effected within the framework of neighborhood districting. Nor was there any finding that total elimination of racial imbalance would be consistent with other principles of adequate education hereafter discussed. The plaintiffs did not try their case on that theory, or present evidence justifying such findings.4

Having reached its conclusions, the court ordered the defendants to submit a plan to correct racial imbalance in the Springfield schools. However, for reasons not explained, instead of requiring the elimination of what it had determined to be unconstitutional segregation, the court's order appears more limited. The defendants were ordered to prepare and present a plan which would "eliminate to the fullest extent possible racial concentration * * * within the framework of effective educational procedures, as guaranteed by the equal protection clause of the Fourteenth Amendment * *." 5 Thus, as we read it, through all of its opinion prior to the order the court appears to hold that the plaintiffs have a constitutional right to the abolition of racial imbalance to preserve their equal educational rights, but its order is restricted to reduction only so far as feasible within the framework of effective educational procedures.

---

3. The court made no specific mention of other educational disadvantages testified to by plaintiffs' expert. For an extensive listing of authorities in this field, see Report of the Advisory Committee on Racial Imbalance and Education, Massachusetts State Board of Education, 82–86, 105–108, 131–32 (April 1965).

4. In their brief plaintiffs point to a statement by their expert that elimination of imbalance should not "pose a serious problem." Quite apart from the fact that the court made no reference to this testimony, we note that the witness's qualifications were solely in the psychological and sociological disciplines.

5. The language of this order, as will be shortly apparent, derives from an extrinsic source.

The difference between the court's order, at least as we interpret it,[6] and the seeming absolutism of its opinion unilluminated by its order, is substantial. "Effective educational procedures" involve many factors, and must concern all students. The neighborhood plan is not simply a matter of administrative convenience and cost. In the elementary schools there are problems of transportation which may seem important to individual families, and there is, of course, beyond that the much mooted issue of large scale "bussing." Pedestrian crossing of traffic arteries is dangerous for the lower ages. Other values may exist, both for the children and the parents, in having the school close to the home.[7] Correspondingly, the very correction of racial imbalance may have adverse effects upon the educational environment.[8]

■ Certain statements in the opinion, notably that "there must be no segregated schools," suggest an absolute right in the plaintiffs to have what the court found to be "tantamount to segregation" removed at all costs. We can accept no such constitutional right. Cf. Bell v. School City of Gary, 7 Cir., 1963, 324 F.2d 209, cert. den. 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216; Downs v. Board of Education, 10 Cir., 1964, 336 F.2d 988, cert. den. 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800. We pass the unsettling problem which would face every school committee of anticipating what amount of imbalance the local federal court will consider equivalent to segregation. The difficulties prophesied in applying the relatively simple rule of "one man, one vote" would seem small in comparison. Deciding what is excessive racial imbalance necessarily involves the resolution of expert appraisals of highly intangible factors. But more fundamentally, when the goal is to equalize educational opportunity for all students, it would be no better to consider the Negro's special interests exclusively than it would be to disregard them completely.

We do not, however, construe the court's order as calling for such radical correction of the imbalance found.[9] Rather, we take it to determine that, because of the various circumstances abundantly shown by plaintiffs' witnesses, racial imbalance disadvantages Negro students and impairs their educational opportunities as compared with other races to such a degree that they have a right to insist that the defendants consider their special problems along with all other relevant factors when making administrative decisions.

■ Whether defendants are constitutionally required to furnish this more limited relief which we assume the plaintiffs are presently seeking, we do not reach. The court stated at the outset of its opinion,

"To the credit of the City of Springfield and its school authorities, the School Committee recognized, in September 1963, that racial imbalance did exist in some schools, 'that integrated education is desir-

---

6. We may observe that it is not at all clear how plaintiffs interpret it. In their brief they state the court "enjoined the maintenance of schools with a Negro enrollment of 50% or more," which quite obviously it did not; it enjoined nothing, "and directed the submission * * * [of] a desegregation plan which would eliminate racial imbalance in the school system." Plaintiffs' oral argument, as we understood it, was less extreme.

7. It has been pointed out that some of what may be claimed to be "values" in fact serve to foster ethnic similarities and prejudice. However, all furtherance of security and mutual interests does not fall into negative categories.

8. Even plaintiffs' expert conceded the detriment of forced movement of pupils, although labeling it as less serious than allowing imbalance to continue.

9. In all fairness to the plaintiffs, at least in this court they do not themselves appear to press for so broad an interpretation. Other advocates of judicially supervised correction of imbalance also call for relief "only when the justification for use of geographic criteria does not outweigh the imperfections in the educational opportunity * * *." Fiss, supra, note 1, at 613.

able,' and it resolved to '*take whatever action is necessary to eliminate to the fullest extent possible, racial concentration in the schools within the framework of effective educational procedures.*' Accordingly, it voted to take immediate action to prepare, by March 1964, proposals designed to solve the problem. Unfortunately, this law suit intervened and the defendants discontinued whatever work they had been doing pending the outcome of this litigation." (Ital. suppl.)

Thus when suit was instituted, in January 1964, the school authorities had already recognized *sua sponte*, what the court's order later commanded. The court, in fact, adopted precisely their own words.

To the extent that there may be an underlying constitutional right to effective educational procedures within the limits of the court order as we interpret it, the burden of performance is on the state. While there may be no general obligation to pursue state remedies first, cf. McNeese v. Board of Education, 1963, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622, plaintiffs in this respect have no present need of any remedy whatever.[10] This seems to us a peculiarly inappropriate time to assert the allegedly paramount authority of the federal courts. Plaintiffs are seeking against a state agency an equitable remedy not only not presently needed, but that may never be needed. Cf. Eccles v. Peoples Bank, 1948, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784. If defendants were to complete what they had already started, federal interference need never be requested. Correspondingly, we would be resolving what is, at best, a doubtful question of constitutional law[11] Neither step is of a sort that should be taken until there is occasion for it.

■ Even though we believe no order to be presently required, the question arises whether we should nonetheless retain jurisdiction against future eventualities. See Scott v. Germano, 85 S.Ct. 1525 (6/11/65); Armstrong v. Board of Education, 5th Cir., 1964, 333 F.2d 47, 52. Plaintiffs have pointed to the fact that defendants ceased, or virtually ceased, assertedly on advice of counsel, their voluntary activities upon the institution of suit. We attach no great significance to this. The application of a stick is hardly an encouragement to egg-laying proclivities, golden or otherwise. We forbear wondering whether plaintiffs could not have expected this, and were more interested in a court order itself than in actual performance. We similarly forbear wondering whether defendants' cessation was entirely motivated by concern that their work to find an educationally feasible way to reduce imbalance would be wasted if the court ordered another route to be taken, or was due in part, at least, to pique. Rather, we recognize, as was said in Taylor v. Board of Education, D.C. S.D.N.Y.1961, 191 F.Supp. 181, at 197, aff'd 2 Cir., 1961, 294 F.2d 36, cert. den. 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339.

> "Litigation is an unsatisfactory way to resolve issues such as have been presented here. It is costly, time consuming—causing further delays in the implementation of constitutional rights—and further inflames the emotions of the partisans."

Where no order is called for, we are unprepared to use defendants' inactivity following suit as an excuse for retaining dormant, or anticipatory, jurisdic-

---

10. The statement in plaintiffs' brief that "between the September 19th meeting and January, nothing was done to effectuate the announced policy," is not only unsupported by the record, but flatly contradicted. Their further assertion that "as a result thereof, this suit was commenced" was testified to by no one, even as a basis of the plaintiffs' motive or belief.

11. Indeed, if the issue is as we construe it, no appellate court has yet passed upon it. The Bell, and Downs, cases, supra, ruled upon segregation per se, not upon equality of educational opportunity.

tion. If defendants permanently disregard their previously announced purpose to reduce imbalance so far as educationally feasible, a new action may be brought to determine whether the plaintiffs are, in that event, entitled to relief.[12]

One question remains. Dismissal of the complaint without prejudice because of the existence of the defendants' September 19, 1963 vote makes it desirable, if not imperative, to consider whether we are relying on a vote which is itself unconstitutional. It has been suggested that classification by race is unlawful regardless of the worthiness of the objective. We do not agree. The defendants' proposed action does not concern race except insofar as race correlates with proven deprivation of educational opportunity. This evil satisfies whatever "heavier burden of justification" there may be. Cf. McLaughlin v. State of Florida, 1964, 379 U.S. 184, 194, 85 S.Ct. 283, 13 L.Ed.2d 222. It would seem no more unconstitutional to take into account plaintiffs' special characteristics and circumstances that have been found to be occasioned by their color than it would be to give special attention to physiological, psychological or sociological variances from the norm occasioned by other factors. That these differences happen to be associated with a particular race is no reason for ignoring them. Booker v. Board of Education, 1965, 45 N.J. 161, 212 A.2d 1 [13] ; cf. School Committee of New Bedford v. Commissioner of Education, Mass.1965, 208 N.E.2d 814.

The complaint must be dismissed, but without prejudice to plaintiffs' right to institute a new action in the event of changed circumstances.

Judgment will be entered vacating the order of the District Court and remanding the case with directions to dismiss the complaint in accordance with this opinion.

---

12. Correspondingly, we take no note of legislative and other activity occurring in Massachusetts since the institution of this proceeding.

13. Our citation of this case is not to be taken as an endorsement of the majority vs. the minority resolution of other matters that would extend beyond what we have already stated in this opinion.