Onesephor **BROUSSARD** et al.,
Appellants,

v.

The **HOUSTON INDEPENDENT
SCHOOL DISTRICT** et al.,
Appellees.

No. 24018.

United States Court of Appeals
Fifth Circuit.

May 30, 1968.

Arthur Mandell, Joseph L. Tita, William L. Wood, Jr., Houston, Tex., for appellants.

Joe H. Reynolds, and Reynolds, White, Allen & Cook, Houston, Tex., for appellees.

Ronald Cohen and Al Schulman, Houston, Tex., and Robert L. Carter and Anne G. Feldman, New York City, amici curiae.

Before RIVES and WISDOM, Circuit Judges, and CONNALLY, District Judge.

CONNALLY, District Judge:

This action was filed in the United States District Court for the Southern District of Texas as a suit for injunction against the Houston Independent School District. The plaintiffs are a number of pupils of that District, of the colored race, who have filed the proceeding as a class action. Its purpose is to restain the School District and its officers and employees from acquiring and condemning land, from soliciting bids, accepting bids or distributing funds, letting contracts or doing any other acts in furtherance of an extensive program for the construction of new schools and the improvement and modernization of other schools within the District. This relief was sought upon the allegation that the program of new construction and rehabilitation—in particular the location of a number of

new schools—was designed by the Board to promote and to perpetuate de facto segregation in the schools. It was alleged that such de facto segregation deprived the minor plaintiffs of their right to attend an integrated school, and thus deprived them of due process and equal protection of the laws. After a full hearing consisting of seven trial days and including an inspection by the trial judge [1] of some 17 locations, including the four or five most vigorously attacked by the plaintiffs, the injunctive relief was denied.[2] We affirm.

To bring the issues thus presented into proper focus, some background is necessary. The Board of Education of the Houston Independent School District is composed of seven elected members. It is charged by law with the operation and maintenance of the public school system within its geographic limits. This is an area of approximately 311 square miles, including most of the Houston, Texas metropolitan area. In excess of one million persons reside within its geographic boundaries. Approximately 230,000 scholastics attend its schools, with an average increase of approximately 10,000 students per year. It is the sixth largest school district in the nation. At the time of trial, it operated in excess of 200 schools (elementary, junior high and high schools), located throughout the District.

At the time of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Houston schools were completely segregated by state law, with a dual boundary system. Following Brown, on December 26, 1956 a suit was filed in the United States District Court for the Southern District of Texas (C.A. 10444, Ross v. Board of Trustees, Houston Independent School District) to desegregate the Houston schools. Following a series of hearings the District Court entered an order directing that the schools be desegregated on a one-grade-per-year basis, beginning with the school year of September 1960, with complete desegregation to be effected by 1971. On appeal, this action of the trial court was affirmed [Houston Independent School District v. Ross, 5 Cir., 282 F.2d 95 (1960)]. Since that time the plan of desegregation has been accelerated, in large measure by voluntary action by the Board,[3] so that at the time of trial (June 1966) only the ninth grade remained segregated, and with that remaining vestige to be eradicated beginning with the school year of September 1967.[4]

The record shows that there is in operation a freedom of choice plan, pursuant to which a student, regardless of his race or place of residence, may register at any school within the District, merely by notifying the school authorities of the choice, and by having the student appear at the school of his choice on opening day.[5]

While it would appear at first blush that such a plan would be calculated to lead to overcrowding of some of the more popular schools, the Board's experience has shown that in large measure the students prefer to attend the school in proximity to their homes, and in no instance had admission been denied to a school of one's choice by reason of overcrowding.

With some variations due to population densities, it has been the policy of the Board to space the location of its elementary schools at intervals of approximately one mile; junior high schools at intervals of two miles; and senior high schools at three mile intervals

---

1. The Honorable Allen B. Hannay, an able and experienced trial judge.

2. The District Court opinion is reported 262 F.Supp. 266 (1966).

3. At least such action was "voluntary" in the sense that it was not court ordered.

4. Additionally, the Board had taken steps to integrate its school faculties and its athletic program, each of which had until recently remained largely segregated.

5. This was true at the time of trial for all grades except the ninth, and, as stated, this exception expires with the 1966–67 school year.

throughout the District. Thus inevitably many of the schools are located in predominantly colored residential sections, others in predominantly white residential sections, and still others in areas of a mixed or commingled racial pattern.[6] Similarly, the new construction and renovation is even-handedly applied throughout the District, some in white, some in negro and some in commingled areas. As most of the scholastics, regardless of their race, prefer to attend the school in their immediate vicinity,[7] the racial composition of the student body of each school reflects, in general, the racial composition of the neighborhood wherein such school is located.

The need for the construction program is not denied. It is undisputed that many of the existing school facilities are grossly overtaxed; some areas of rapidly increasing population are inadequately served, or served not at all.

On May 19, 1965, the voters of the Houston Independent School District by popular election authorized the issuance of some $59 million in bonds for construction purposes. The program contemplated the construction of a number of new schools, some at new, others at old sites; the construction of new classrooms, the addition of cafeterias, the enlargement of campuses, etc.; and the repairing and refurbishing of existing facilities at still other locations. Some fifty schools were involved in the project.

While this was the largest single bond issue for this purpose in the Board's history, experience had shown that substantial new construction was necessary at intervals of approximately four years. Preceding issues had been in the amount of $39 million in 1963 and in the amount of $32 million in 1959.

This was the thrust of plaintiffs' case. After developing the fact that certain schools in areas of dense colored population were overcrowded, and that the construction program contemplated the relief of this situation by the erection of new schools close by, or the enlargement of existing facilities, the testimony of several sociologists and psychiatrists was offered. These witnesses, all eminently qualified in their fields, testified in substance that a colored child would not receive as good an education attending a completely, or predominantly, colored school as he would attending a more thoroughly integrated school.[8] Hence the argument was advanced that the construction of a new school in an area of dense negro population, or making an old school more serviceable, more efficient, or more attractive, would, in effect, constitute a denial to the negro child residing in such area of the integrated-type education to which he was entitled.

Despite their pedagogic attainments, none of these witnesses had any experience as a school administrator. They had little familiarity with the overall building program. No one could or would venture a suggestion as to where or how any one of the questioned sites should be relocated. They showed little

---

6. Examples of schools within "fringe areas" and having approximately equal numbers of white and negro students are McGregor Elementary, Kashmere Gardens High, Lockett Junior-Senior High, Rogers Junior High.

 Brock Elementary School furnishes an interesting example of the effect which a change in residential pattern will have on a school. Originally attended principally by white children, the number of negro children increased as the complexion of the neighborhood changed from white to colored. Now it is predominantly negro. Another interesting example of a mixed racial pattern is that of McReynolds School. It is approximately 49% Latin-American, 49% Anglo-American, and 2% negro.

7. This is the testimony of plaintiffs' witnesses, and confirmed by School Board records.

8. These witnesses further testified that the Board should take as its objective the achievement of the same white to colored ratio in *each school* as prevailed in the overall census of the scholastics within the District (namely 70% white, 30% negro). They further testified that this should be achieved by bussing the students outside of their residential areas, if other expedients were ineffective.

awareness of any factor to be taken into account in the location of a school other than the racial composition of the area. The only answer which these witnesses could offer to the question as to how they would solve the problem of locating the new schools was to say that they should not be located in a predominantly negro area;[9] and to say further that if given time they (the experts) could no doubt find a better location.

The defense was that the policy of the School Board, past and present, was to build the schoools where they were needed, i. e., where they would be most convenient for the students, particularly those of tender years. It was shown that in addition to the need for a school in a given area, many considerations came into play in the selection of a particular site. Among others were (a) economics—in some cases the Board, with foresight, had previously acquired property not then needed, but held for future use which might profitably be availed of at this time, (b) accessibility and convenience—including the condition of the streets, the avoidance of traffic hazards, etc., and (c) coordination with the City Planning Commission, with realtors and developers planning new subdivisions and developments, where large population increases might be anticipated. On abundant and convincing evidence, Judge Hannay found that the Board had been guided only by such proper considerations as these, and denied relief. Deal v. Cincinnnati Bd. of Ed., 369 F.2d 55 (6th Cir. 1966); Clark v. Board of Educ. of Little Rock, 369 F.2d 661 (8th Cir. 1966); Sealy v. Dept. of Public Instruction of Pa., 252 F.2d 898 (3rd Cir. 1958).

When carefully analyzed, the plaintiffs' position is simply this. No new schools should be built, or old schools improved, in densely populated colored areas. The child resident in such area, regardless of his wishes, of necessity must be required to attend a school in some other section with a relatively high ratio of colored-to-white students. Considerations of convenience, of traffic hazards, or the wishes of the student and his parents should be disregarded. Such child simply would *have* to attend a high ratio colored-to-white school, *and would be required to do this only because he was a negro.*

■ The Constitution does not require such a result, and we entertain serious doubt that it would permit it. Racial imbalance in a particular school does not, in itself, evidence a deprivation of constitutional rights. Zoning plans fairly arrived at have been consistently upheld, though racial imbalance might result. Swann v. Charlotte-Mecklenberg Bd. of Ed., 369 F.2d 29 (4th Cir. 1966); Springfield School Committee v. Barksdale, 348 F.2d 261 (1st Cir. 1965); Wheeler v. Durham City Board of Education, 346 F.2d 768 (4th Cir. 1965); Gilliam v. School Board of City of Hopewell, Virginia, 345 F.2d 325 (4th Cir. 1965); Downs v. Board of Ed. of Kansas City, 336 F.2d 988 (10th Cir. 1964); Bell v. School City of Gary, Indiana, 324 F.2d 209 (7th Cir. 1963).

■ Houston has not adopted a zoning plan. Rather, under the Houston plan, a child may attend the school of his choice. Those negro children who wish to attend a school some distance from their homes, with a high colored-white ratio, may do so. But those negro children who wish to attend a school close to their homes have constitutional rights, too; and they well might assert such rights against a School Board which refused to construct a needed school in their area simply because it would be attended largely by negro students. This would be discrimination with a vengeance, based solely on account of race. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686 (1954). And would it not constitute discrimination to

---

9. These witnesses all seem to have a great affinity for the word "ghetto". They repeatedly referred to certain sections of this city by that term. Judge Hannay found no ghetto-type conditions in the vicinity of any of the sites which he visited.

hold, as plaintiffs would have us hold, that *every child in Houston* may attend the school of his choice—chosen, perhaps, because it is convenient, because his best girl attends, because it has a good football team, or for any other sufficient reason—except those children living in the Fifth Ward; and to hold that they must attend the school chosen for them because of what others have determined to be a favorable colored-white student ratio? [10] In their zeal to press for integration of the races at all levels and in all things—scholastic, business, social, marital—many persons, some of good will, completely lose sight of the rights of those who do not desire to be integrated at the moment. The Constitution protects that right, also. The recognition given by Court decree and by statute in recent years to the negro's constitutional freedom from enforced segregation in the field of public education, public transportation, voting, jury service and in related areas is to a privilege which he may enjoy. But integration, at these levels, is not a concept to which, like Procrustes' bed, every individual must be fitted, regardless of his desires. If a negro prefers to ride in the rear of the bus today, he may not be compelled to take a forward seat. If he wishes to vote, he may; but he may not be required to cast his ballot by those who feel it would be to his, or their, benefit that he do so. Of most recent recognition, he may intermarry with one of another race.[11] The Constitution affords him these rights, not recognized until recently. It does not impose an obligation on him to exercise

them. It is for him to decide whether it be to his advantage. The individual is still the master of his fate.[12]

 The validity of the defendant Board's freedom of choice plan is attacked by the plaintiffs. It is argued that when new schools are completed in the colored sections, they will be too convenient and too attractive; and under the freedom of choice will tend to produce a high incidence of de facto segregation. Hence we observe that a freedom of choice plan—fairly and non-discriminatorily administered—has had the specific approval of this court as recently as the en banc consideration of United States v. Jefferson County Bd. of Ed., 380 F.2d 385 (5th Cir. 1967), where the court said:

> "Freedom of choice is not a goal in itself. It is a means to an end. A schoolchild has no inalienable right to choose his school. A freedom of choice plan is but one of the tools available to school officials at this stage of the process of converting the dual system of separate schools for Negroes and whites into a unitary system. The governmental objective of this conversion is—educational opportunities on equal terms to all. The criterion for determining the validity of a provision in a school desegregation plan is whether the provision is reasonably related to accomplishing this objective." [13]

While we reiterate that "a schoolchild has no inalienable right to choose his school", we add the corollary that where

---

10. Bradley v. School Board of City of Richmond, 345 F.2d 310 (4th Cir. 1965).

11. Loving v. Commonwealth of Virginia, 388 U.S. 12, 87 S.Ct. 1817, 1824, 18 L.Ed. 2d 1010 (June 12, 1967), where the Court states, "Under our Constitution, the freedom *to marry, or not marry,* a person of another race resides with the individual and *cannot be infringed by the State."* (Emphasis added.)

12. "It is the individual who is entitled to the equal protection of the laws." McCabe v. Atchison, Topeka & Santa Fe R. Co., 235 U.S. 151, 35 S.Ct. 69, 59

L.Ed. 169 (1914); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

13. And see the language of Judge Wisdom, speaking for this Court in Singleton v. Jackson Municipal Separate School District, 355 F.2d 865 (1966), at p. 871:
 "At this stage in the history of desegregation in the deep South a 'freedom of choice plan is an acceptable method for a school board to use in fulfilling its duty to integrate the school system.'"
 and cases there cited.

the law or rules of the School Board afford this right to others,[14] it may not be denied to the negro child because of his race.

Indeed, under the Houston plan, as described by the school authorities, it would appear that an "integrated, unitary school system" is provided, where every school is open to every child. It affords "educational opportunities on equal terms to all." That is the obligation of the Board.[15]

The action of the trial court was right, and is

Affirmed.

## WISDOM (dissenting).

I respectfully dissent.

It seems scarcely possible that in the Fifth Circuit a school board in a great city could look a judge in the eye and say that in spending sixty million dollars for school buildings the board need not consider residential racial patterns as a relevant factor in the selection of school sites. The Houston School Board knows, everyone knows, that the location of schools is highly relevant to school segregation.

I can understand, though I can not accept, the Board's explanation of its decision. The Board relied on the *Briggs* dictum: "The Constitution * * * does not require integration. It merely forbids discrimination." *Briggs v. Elliott*, E.D.S.C.1955, 132 F.Supp. 776. Many other school boards throughout the South have been willing victims of the *Briggs* word-magic. They embraced the

chains that held them captive. The glitter of the rhetoric obscured the looseness of their bonds.

I doubt if many laymen understand the question-begging distinction between "desegregation" and "integration". In the vernacular there is no distinction. But here, as in similar situations in other states, the lay board understood the effect of their lawyers' reading of *Briggs*. As stated in the Board's brief: "There is no affirmative duty on the School District to consider race in the selection of school sites"; that would be an affirmative act leading to integration.[1]

In the years that first followed the *School Desegregation* cases, Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, apologists for token desegregation could rationalize the Delphic riddle *Briggs* found in *Brown*.[2] *Briggs* offered a middle way in a difficult transitionary period. And the lack of specific directions in the Supreme Court's mandate in *Brown* along with a district court's inherent equitable power and primary responsibility for tailoring decrees to individual cases seemingly gave inferior courts wide latitude in their handling of school desegregation plans. Later and slowly, by the case-by-case development of the law, the Supreme Court put limits on the scope of an inferior court's authority to bless token action to desegregate schools.[3]

There is no ameliorating reason for the majority's decision. It offends the law as it existed in this circuit at the time the case was argued on appeal.[4] It offends the law more egregiously now.[5]

---

14. Such is the case here. The plaintiffs do not challenge the freedom of choice as applied to white students, nor question the new construction in white or in mixed residential areas.

15. United States v. Jefferson County Bd. of Ed., supra, 380 F.2d p. 390, en banc consideration.

1. The Board's brief states: "there is only one legal issue. That issue is whether or not the school district has this affirmative duty to integrate the races".

2. *Briggs* was one of the original *School Desegregation* cases.

3. See, e. g. Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; Bradley v. School Board of City of Richmond, 1965, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187; Rogers v. Paul, 1965, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265.

4. United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 847, aff'd en banc, 1967, 380 F.2d 385, cert. denied sub nom. Caddo Parish School

5. See note 5 on page 823.

## I.

The broad question this case presents is whether the administrators of a public school system are under a duty to take affirmative action to desegregate the school district. The Board faced up to this issue.[6] The narrow question before the Court is whether, in a context necessarily involving a choice of alternatives, a school board should select sites tending to erase the effects of the dual system of legalized segregated schools or is free to select sites tending to maintain segregation (or token desegregation). The Board recognized the presence of this issue, but resolved it by determining that consideration of race would be an affirmative integrative act that need not be taken.

My brothers sweep the issues under the rug.

The Court does not discuss whether the Board was right or wrong to rest its actions on the lack of a duty to take any affirmative action that might lead to integration. The Court does not discuss the Board's deliberate decision to disregard the racial factors in school site selection. Instead, my brothers try to justify the Board's action by finding a rational relationship between the sites selected and certain nonracial factors,

such as safety of access, the use of previously acquired property, and coordination with the City Planning Commission.[6a] No one doubts the relevance of such criteria. But a relationship otherwise rational may be insufficient in itself to meet constitutional standards—if its effect is to freeze-in past discrimination. For example, a rational relationship exists between literacy or citizenship tests (fairly administered) and the right to vote. But we enjoin the use of such tests when they freeze into a voters' registration system the effects of past discrimination.[7] Again, a rational relationship may exist between preservation of the peace and segregation of schools. That was Little Rock's argument. The Supreme Court held that it was not enough.[8]

The Negro plaintiffs do not charge the Board with bad faith. Nor do I. The Board acted on the advice of its lawyers; the lawyers relied on *Briggs* and on decisions in this circuit which followed *Briggs*.

At most, however, *Briggs* addressed itself to a school board's duty, not to its power. And the duty dealt with was the Board's minimum, negative duty to the individual complainant, not its duty in administering a public school system to

Board v. United States, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103; Lee v. Macon County Board of Education, M.D.Ala. 1964, 231 F.Supp. 743; 1966, 253 F.Supp. 727; 1967, 267 F.Supp. 458; Braxton v. Board of Public Instruction of Duval County, M.D.Fla. 1962, 7 Race Rel.L.Rep. 675, aff'd 5 Cir. 1964, 326 F.2d 616, cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216.

5. Stell v. Board of Public Education for the City of Savannah and the County of Chatham, 5 Cir. 1967, 387 F.2d 486; Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1968, 393 F.2d 690; United States v. Board of Public Instruction of Polk County, Fla., 5 Cir. 1968, 395 F.2d 66 [No. 25768, April 18].

6. See footnote 1.

6a. Many factors are relevant to the proper selection of school sites: safety, accessibility, economical use of city property, coordination with city planners, and so

on. But as Judge Tuttle said in Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1966, 364 F.2d 896, 901: " * * * there is a hollow sound to the superficially appealing statement that school areas are designed by observing safety factors, such as highways, railroads, streams, etc. No matter how many such barriers there may be, none of them is so grave as to prevent the white child whose 'area' school is Negro from crossing the barrier and enrolling in the nearest white school even though it be several intervening 'areas' away."

7. See United States v. State of Louisiana, E.D.La. 1963, 225 F.Supp. 353, aff'd 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709; United States v. Mississippi, S.D.Miss. 1964, 229 F.Supp. 925, rev'd 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717.

8. Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5.

take affirmative action to provide equal educational opportunities to all (Negro school children as a class) by eradicating the vestiges and effects of the dual system of segregated schools.

## II.

For most school boards *Briggs* stood like Horatius at the bridge, repelling the invaders while the city fathers cut down the bridge behind him and fortified the city. However, early in 1966 this Court criticized *Briggs*. Singleton v. Jackson Municipal Separate School District, 5 Cir., 355 F.2d 865. In December 1966, a month before this case was argued on appeal, this Court repudiated *Briggs*. United States v. Jefferson County Bd. of Ed., 1966, 5 Cir., 372 F.2d 836. The Court en banc, in March 1967, adopted the panel's opinion and decree, and specifically overruled earlier decisions to the extent that they followed *Briggs*. We said:

> The Court holds that boards and officials administering public schools in this circuit have the affirmative duty under the Fourteenth Amendment to bring about an integrated, unitary school system in which there are no Negro schools and no white schools— just schools. Expressions in our earlier opinions distinguishing between integration and desegregation must yield to this affirmative duty we now recognize. In fulfilling this duty it is not enough for school authorities to offer Negro children the opportunity to attend formerly all-white schools. The necessity of overcoming the effects of the dual school system in this circuit requires integration of faculties, facilities, and activities, as well as students. To the extent that earlier decisions of this Court (more in the language of the opinions, than in the effect of the holdings) conflict with this view, the decisions are overruled. 380 F.2d at 389.

This conclusion was an inevitable development. We had already required faculty integration in public schools. Obviously, faculty integration cannot be accomplished without affirmative action, affecting a school system as a whole, based on taking into account the racial composition of faculties.[9]

With respect to site selection of schools, the decision of the majority in this case is flatly contrary to *Jefferson*. The *Jefferson* en banc decree provides:

### NEW CONSTRUCTION

> The defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual system.

We explained this provision in the earlier opinion:

> Here race is relevant, because the governmental purpose is to offer Negroes equal educational opportunities. The means to that end, such as disestablishing segregation among students, distributing the better teachers equitably, equalizing facilities, selecting appropriate locations for schools, and avoiding resegregation must necessarily be based on race. School officials have to know the racial composition of their school populations and the racial distribution within the school district. The Courts and HEW cannot measure good faith or progress without taking race into account. 372 F.2d at 877.

The majority's decision on the Houston school construction program is also flatly contrary to a three-judge court's decision on ninety-nine school systems in Alabama, a state with racial problems at least as difficult as those in Texas. In Lee v. Macon County Board of Education, M.D.Ala.1967, 267 F.Supp. 458, a unanimous court ordered state officials

---

9. See Bradley v. School Board of City of Richmond, 1965, 380 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187; Rogers v. Paul, 1965, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265.

to withhold approval of sites for the construction or expansion of schools

if, judged in light of the capacity of existing facilities, the residence of the students, and the alternative sites available, the construction will not, to the extent consistent with the proper operation of the school system as a whole, further the disestablishment of state enforced or encouraged public school segregation and eliminate the effects of past state enforced or encouraged racial discrimination in the State's public school system.

The court also enjoined further reliance upon surveys not conducted in accordance with the standards of this Court in the approval of school sites. 267 F.Supp. at 480–481.

On the subject of school construction, these decisions do not stand alone. In 1962 a district court issued a decree enjoining the Jacksonville School Board from "Approving budgets, making funds available, approving employment contracts and construction programs, and approving policies, curricula and programs designed to perpetuate, maintain or support a school system operated on a racially segregated basis". This Court approved the decree. Board of Public Instruction of Duval County, Fla. v. Braxton, 5 Cir. 1964, 326 F.2d 616. We said: "The argument of appellants here is largely to the effect that no court heretofore has expressly required * * the planning of schools and finances to avoid racial operation of the schools. This argument * * * falls far wide of the mark." 326 F.2d at 620.

This Court has stood firmly behind Jefferson.[10] We have said, "No panel

10. See Stell et al. v. Board of Public Education, et al., supra, page 492 of 387 F.2d. "[W]ith respect to provisions of Section VII of the *Jefferson* decree, dealing with new construction, [t]here is no basis for not requiring the provisions of that section to be a part of the order affecting the operation of the Dougherty County school system. Otherwise, the court may be faced in the future with a *fait accompli* after the board may have purchased land and entered into contracts for new schools without having complied with the requirements of this provision."

March 12, 1968, in Davis v. Board of School Commissioners of Mobile, 5 Cir., 393 F.2d 690 this Court entered a decree containing the following provision:

CONSTRUCTION

To the extent consistent with the proper operation of the school system as a whole, the school board will, in locating and designing new schools, in expanding existing facilities, and in consolidating schools, do so with the object of eradicating past discrimination and of effecting desegregation. The school board will not fail to consolidate schools because desegregation would result.

Until such time as the Court approves a plan based on the survey conducted pursuant to section IV herein, construction shall be suspended for all planned building projects at which actual construction has not been commenced.

Leave to proceed with particular construction projects may be obtained prior to the completion of the survey upon a showing by the appellees to the Court, that particular building projects will not have the effect of perpetuating racial segregation."

February 24, 1968, in Carr v. Montgomery County Board of Education, M.D.Ala., the Court found: "The evidence further reflects that the defendants have continued to construct new schools and expand some existing schools; certainly, there is nothing wrong with this except that the construction of the new schools with proposed limited capacities geared to the estimated white community needs and located in predominantly white neighborhoods and the expansion of the existing schools located in predominantly Negro neighborhoods violate both the spirit and the letter of the desegregation plan for the Montgomery County School System. Examples of this are the construction of the Jefferson Davis High School, the Peter Crump Elementary School and the Southlawn Elementary School—all in predominantly white neighborhoods—and the expansion of Haynesville Road School and the Carver High School, both in predominantly Negro neighborhoods. The location of these schools and their proposed capacities cause the effect of this construction and expansion to perpetuate the dual school system based upon race in the Montgomery County School System. * * * All of this means that the defendants have fail-

of this Court * * * has the authority to permit deviation from those provisions of the *Jefferson* decree which deal with matters of substance and policy." [11] In our most recent decision relating to new school construction, United States v. Board of Public Instruction of Polk County, Fla., 395 F.2d 66 [No. 25768, April 1968], Judge Tuttle, speaking for the Court, quoted with approval the provision of the *Jefferson* decree regarding new construction, and then pointed out:

> The appellee contends that inasmuch as the planning for the school was made without reference to race, there was no conscious effort on the part of the Board to perpetuate the dual system. This does not meet the requirements of the court order. There is an affirmative duty, overriding all other considerations with respect to the locating of new schools, except where inconsistent with "proper operation of

the school system as a whole" to *seek* means to eradicate the vestiges of the dual system. It is *necessary* to give consideration to the race of the students. It is clear from this record that neither the state board nor the appellee sought to carry out this affirmative obligation, before proceeding with the construction of this already planned school.

### III.

Here the Board admittedly declined to consider racial residential patterns.[11a] Instead, it chose the centers of Negro residential areas, present and projected, for many new schools. This building program was carried out in a school district where an illusory freedom of choice plan, one that does not comply with the *Jefferson* standards in many respects, has resulted only in token desegregation.[12] A few Negro children attend some white schools, many white chil-

ed to discharge the affirmative duty the law places upon them to eliminate the operation of a dual school system." The Court's order contains the provision: "The school board will obtain approval from the State Superintendent of Education prior to letting contracts for or proceeding with the construction of any new school or any additions to an existing school. The State Superintendent will, upon receipt of such proposals, take appropriate action on said proposals as required by the March 22, 1967, decree entered in Lee et al. v. Macon County Board of Education et al., 267 F.Supp. 458, 470–472, 480–481.

11. Gaines v. Dougherty County Board of Education, 5 Cir. 1968, 392 F.2d 669.

11a. "If a school board is constitutionally forbidden to institute a system of racial segregation by the use of artificial boundary lines, it is likewise forbidden to perpetuate a system that has been so instituted. It would be stultifying to hold that a board may not move to undo arrangements artificially contrived to effect or maintain segregation, on the ground that this interference with the status quo would involve 'consideration of race.' When school authorities, recognizing the historic fact that existing conditions are based on the design to segregate the races, act to undo these illegal conditions—especially conditions that

have been judicially condemned—their effort is not to be frustrated on the ground that race is not a permissible consideration. This is not a 'consideration of race' which the Constitution discountenances. * * * there is no legally protected vested interest in segregation. If there were, then Brown v. Board of Education and the numerous decisions based on that case would be pointless. Courts will not say in one breath that public school systems may not practice segregation, and in the next that they do nothing to eliminate it." Wanner v. County School Board of Arlington County, Va., 4 Cir. 1966, 357 F.2d 452, 454–455.

12. In a number of respects the Houston plan falls far short of the standards required by Jefferson. Assignments are made initially on the basis of race. The plan does not require all students to make an annual choice. The Board sent out only 26,000 letters or notice to parents in a district of 236,000 students; these were inexplicit and contained no choice forms. Bus routes "were set up * * * on a segregated basis" and the "present transportation policy or transportation of the routes in force now will continue", as Dr. Westmoreland, Assistant Director for Transportation, testified. Some. Negro children are bussed 20 miles to segregated schools, although there are white schools much closer to their homes. No notice of the plan is given to parents.

dren resegregate, and the great mass of Negro children in Houston continue to receive the inferior education that is indelibly a part of segregated schooling.[13]

Houston's "freedom of choice" plan was superimposed on existing dual attendance zones. The Superintendent of Schools testified that the various school boundary lines which now determine the assignment of children to schools "are the vestiges of when the schools did have a segregated system under law"; that these lines have been "maintained pretty much on the same basis since 1964". The Board with no apologies, asserts in its brief, "In selecting school sites for any new schools in the Houston School District, segregation was not a factor". The failure of the Houston's freedom of choice plan therefore was not a peripheral question but was the central fact the Board should have considered in selecting new school sites. The foreseeable effect of mere genuflecting toward freedom of choice while carrying out a new building program was to freeze existing school patterns. Old "Negro" schools are to continue as Negro schools and new Negro schools are being built for all-Negro student bodies.[14]

The Negro plaintiffs have taken a moderate position. They did not ask for cross-town bussing. They modestly asked the Board to consider residential patterns as one of a number of relevant factors in the site selection of public schools.[15] The complaint asked only for an injunction against construction of

13. Approximately 95 per cent of all of the Negro school children in Houston attend all-Negro schools. Two per cent attend integrated junior high schools. One per cent attend integrated senior high schools. As of the date of the trial, the assignment to secondary schools was based on the old dual racial boundaries.

14. In Jefferson, 5 Cir. 1967, 372 F.2d at 876, we said "Here school boards, utilizing the dual zoning system, assigned Negro teachers to Negro schools and selected Negro neighborhoods as suitable areas in which to locate Negro schools. Of course the concentration of Negroes increased in the neighborhood of the school. Cause and effect came together. In this circuit, therefore, the location of Negro schools with Negro faculties in Negro neighborhoods and white schools in white neighborhoods cannot be described as an unfortunate fortuity." In Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1966, 364 F.2d 896, 901, Judge Tuttle, for the Court, observed: "When spoken of as a means to require Negro children to continue to attend a Negro school in the vicinity of their homes, it is spoken of as a 'neighborhood' school plan. When the plan permits a white child to leave his Negro 'neighborhood' to attend a white school in another 'neighborhood' it becomes apparent that the 'neighborhood' is something else again. As every member of this court knows, there are neighborhoods in the South and in every city in the South which contain both Negro and White people. So far as has come to the attention of this Court, no Board of Education has yet requested that every child be required to attend his 'neighborhood' school if the neighborhood school is a Negro school. Every Board of Education has claimed the right to assign every white child to a school other than the neighborhood school under such circumstances. And yet, when it is suggested that Negro children in Negro neighborhoods be permitted to break out of the segregated pattern of their own race in order to avoid the 'inherently unequal' education of 'separate educational facilities,' the answer too often is that the children should attend their 'neighborhood school.'"

Review of the record and Exhibits relative to Transportation, Pupil Assignment, the 'choice plan', and placement of new schools leaves little doubt as to the intent of the local district—it is clearly to perpetuate segregation at any cost. The neighborhood school concept is but another means toward that illegal end.

15. The plaintiffs contend that Negro children living near white schools are bussed up to fourteen miles to Negro schools and that white children living near Negro schools are bussed to white schools. The Board counters that the Negro children may get off the busses to attend any white school along the way which they attend in accordance with the freedom of choice plan.

The plaintiffs divided the building projects into three categories: (1) new schools and expanded facilities in areas of heavy concentration of Negroes (as to these the board acknowledged that the building program would result in con-

facilities "in such a manner as will promote and perpetuate segregation and/or substantially delay desegregation".

## IV.

When the majority of the Court in this case rejected the plaintiffs' request for injunctive relief pending the appeal the Board's building program became a *fait accompli.* By now therefore the Houston plan for continued token desegregation by a selective school site program is nearing completion. It is not too late however for the Board to survey the situation and to propose expedients to undo the effects of its building policy.

It is not too late to sound a note of caution to school boards in other cities which may adopt a large-scale school construction program. With deference, I suggest that such school boards bear in mind that the majority's decision is irreconcilable with Jefferson, Lee v. Macon County Board of Education, and *Braxton*; and that recent decisions fully support *Jefferson*, in general and specifically as to school construction. It is not too late to heed these decisions.

I remind all school boards in this circuit that the Houston Board relied on *Briggs* as its authority for declining to take affirmative action to overcome the effects of the dual system of de jure segregated schools. But *Briggs* has fallen. There is a bridge under construction, resting on the Constitution, connecting whites and Negroes and designed to lead the two races, starting with young children, to a harmonious, peaceful, civilized existence. That bridge is a plan for equal educational opportunities for

all in an integrated, unitary public school system based on school administrators *affirmatively finding ways to make the plan work.*

Black nationalists and white racists to the contrary, school integration is relevant. It is an educational objective as well as a constitutional imperative.

## SUPPLEMENTAL OPINION.

### CONNALLY, District Judge.

While I consider the issues both of fact and of law presented by this record to have been fully discussed and clearly decided in the original opinion, the dissent of Judge Wisdom constitutes an indictment of the defendant School Board and an accusation that the majority herein "flatly disregarded" the accepted law of this Circuit.[1] Hence I feel an additional word may be appropriate. The theme for the indictment of the defendant Board is that it is not sufficiently integration oriented, and the charge, contrary to the findings of the trial court, that what it has done looking toward desegregation has not been done in good faith.[2]

It should be borne in mind that the freedom of choice plan, and the bona fides of its application, is at issue here, if at all, only in a peripheral sense. It is squarely in issue in an entirely separate action pending since 1956 in the District Court of the Southern District of Texas, where most of the problems attendant upon the desegregation of this largest school district in the south have been solved amicably, and where the solu-

---

tinued segregation for the foreseeable future); (2) projects, not necessarily planned for Negro residential areas, which will reinforce patterns of segregation; (3) projects having an uncertain effect on segregation. The plaintiffs asked for a committee of experts to study these projects to determine their effect on segregation.

1. As announced in United States v. Jefferson County Board of Education, 380 F.2d 385.

2. For example, (1) " . . . the Board's unyielding policy, . . . is transparently a dodge to maintain segregated schools." (2) "Houston's illusory freedom of choice plan." (3) "A freedom of choice plan (such as Houston's) is only a graceless genuflection toward the unitary integrated public school system the Constitution requires."

No mention is made of the steps taken toward faculty integration, integration of the athletic program, of the bus system designed to facilitate the exercise of the freedom of choice plan, etc.

tions have in general had approval of this Court, 282 F.2d 95 (1960); Ross v. Dyer, 312 F.2d 191 (1963).

What is at issue here is whether this $59 million construction program, planned, financed, and begun long before the controversy giving rise to *Jefferson* had matured, and while that opinion, which ultimately became the law in this Circuit, lay dormant in the heart of its author, should be enjoined as contrary to *Jefferson*.[3]

*Jefferson* imposed a duty on school authorities "to the extent consistent with the proper operation of the school system as a whole" affirmatively to consider the effect which a proposed new location or expansion might have upon the question of integration; and to choose between possible alternatives that which would tend to promote integration of student bodies. This mandate is perhaps more clearly spelled out in United States v. Board of Public Instruction of Polk County, Florida, 395 F.2d 66 (5th Cir., April 18, 1968). Admittedly, the Houston school authorities did not affirmatively consider this factor, but followed the practice, then sanctioned both by law and custom, of selecting sites which would best serve the needs of all of the scholastics of the district. The Board's good faith in seeking neither to attract nor to divert scholastics of either race to or from a particular school is found affirmatively by the trial court upon abundant evidence. The question then is whether a court of equity should enjoin a program of this magnitude, well under way, because the school authorities were not endowed with sufficient prescience to anticipate *Jefferson* by some two years. We would answer in the negative. This is required, we believe, by additional considerations not heretofore mentioned. The Houston School Board is not the only party interested in this litigation or who would be adversely affected by the injunction which the plaintiffs seek. There are hundreds of contractors and subcontractors, and thousands of laborers whose work would be disrupted if this project were halted.[4] The 230,000 scholastics need the improved facilities which are (or were) in the course of construction. Their interests would not be served by granting the injunction.

And what is the alternative? The plaintiffs offer none. There is no suggestion that Tract A would be a better site than Tract B. There is no comparison of price, of accessibility, or of any other factor. The plaintiffs ask only for delay, so that someone may search for other sites which the plaintiffs might consider more suitable. Whether this would require six months or six years is not disclosed. Meanwhile, the district would be required to pay interest on its $59 million debt, and all of those whom it serves would be deprived of the new facilities. We do not feel that a court of equity should lend its hand to this result. Other construction programs will be begun, and other sites selected, since *Jefferson* has been written. They should, and no doubt will, be undertaken with its mandate in mind. It should not be given a retroactive effect unfairly to penalize this program undertaken in good faith and in full compliance with the law as it then existed.

After all, the granting of an injunction rests in the sound discretion of the Court to be exercised in accordance with equitable principles and in the light of all the facts and circumstances in the

---

3. The chronology is as follows:

 May 24, 1966—present action filed in District Court;

 July 13, 1966—District Court opinion filed;

 December 29, 1966—first Jefferson opinion;

 January 25, 1967—present action submitted to this Court;

 March 29, 1967—en banc Jefferson opinion.

4. It is interesting to note that not a word has heretofore been said as to whether plaintiffs were able or willing to post a bond to protect against damage if the injunction be issued wrongfully. The United States is not a party to this action.

case.[5] That is especially true here since the record shows that the constitutional rights of the students are otherwise protected by an adequate freedom of choice plan. In our opinion, far from abusing its discretion, the District Court acted properly under all of the facts and circumstances of this case.

5. City of Montgomery, Alabama v. Gilmore, 5th Cir. 1960, 277 F.2d 365, 370;

43 C.J.S. Injunctions § 14; 28 Am.Jur., Injunctions § 35.