**CITIZENS FOR BETTER EDUCATION, et al., Appellants,**

**v.**

**GOOSE CREEK CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, et al., Appellees.**

No. 01–85–0837–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 28, 1986.

Rehearing Denied Nov. 13, 1986.

George M. Kirk, Jr., Houston, for appellants.

Richard A. Peebles, Reid, Strickland & Gillette, Baytown, for appellees.

Before SAM BASS, DUNN and COHEN, JJ.

## OPINION

COHEN, Justice.

The appellants seek review of the trial court's denial of permanent injunctive relief in their suit to invalidate a rezoning plan adopted by the Board of Trustees of the Goose Creek Consolidated Independent School District ("the trustees"). The appellants are a group of parents who reside in the school district.

Goose Creek Consolidated Independent School District contains two high schools, Robert E. Lee and Ross S. Sterling, which in past years had been similar in size, socioeconomic makeup, test scores, and ethnic balance. The trial court found that in recent years, demographic patterns were changing the ethnic composition of the two high schools, and that the trustees studied possible alternatives for preventing ethnic and socioeconomic isolation between the schools. Two public hearings were held on the issue. The trustees eventually adopted a rezoning plan that changed the attendance zones for Lee and Sterling, shifting some boundaries to the north. The plan also moved the bilingual education program from Lee to Sterling. Other than bilingual students, only students *entering* high school after the 1984–85 school year are affected by the plan, which also includes a sibling exception. Consequently, no students presently attending either school are required to change schools.

The record reflects that Lee and Sterling High Schools are 3.6 miles apart, a distance

that can be traveled by car in 10 minutes. It shows that while some students will have to be bussed to school solely due to boundary changes, most of those who will be bussed would have ridden a bus to school anyway.

The appellants charge that the rezoning plan was an illegal white/Anglo effort to change "a perceived ethnic imbalance" between the two high schools in the district. The parties agree that there is no issue of *de jure* segregation within the school district, but the appellees argue that it was concern over future *de facto* segregation that motivated the board's efforts to more evenly distribute the ethnic compositions of Lee and Sterling High Schools.

In eight points of error, the appellants claim that the lower court erred in refusing the requested injunction, because (1) the trustees had no power to voluntarily implement a student assignment plan based on race to remedy an imbalance caused by demographic changes in the district; (2) the trustees acted outside the scope of their discretionary powers in adopting the plan and acted with discriminatory purpose; (3) the rezoning plan is contrary to federal and state constitutional authority; and (4) sections 21.074 and 21.075 of the Texas Education Code require that the parents of affected students be given individual hearings to contest the "transfer" of their children to a new school.

■ The appellants point out that there was no legal obligation of the trustees to implement a desegregation plan, absent a finding of segregation. But the absence of a court order to desegregate does not mean that a school board cannot exceed minimum requirements in order to promote school integration. School authorities are traditionally given broad discretionary powers to formulate and implement educational policy and may properly decide to ensure to their students the value of an integrated school experience. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971); *North Carolina State Board of Education v. Swann*, 402 U.S. 43, 45–46, 91 S.Ct. 1284, 1285–86, 28 L.Ed.2d 586 (1971).

> School authorities ... might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court.

*Swann v. Charlotte-Mecklenburg*, 402 U.S. at 16, 91 S.Ct. at 1276. Thus, the trustees had authority to do, as a matter of educational policy, what a court had no power to do in the absence of a finding of segregation.

The appellants assert that the plan violates their constitutional rights of equal protection and due process of law. Appellants attack a voluntary effort by school authorities to achieve ethnic balance. We are not concerned here with the constitutionality of distributing a limited number of privileges on the basis of race, as was the case in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). The parties acknowledge that both schools provide a quality education; that no child has been excluded from school or assigned to an inferior school; and that there is no constitutional right to attend a particular school.

■ A primary purpose of the equal protection clause is to prevent government conduct that discriminates on the basis of race. *See Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Though race is generally considered a suspect classification, it was used in this case to promote integration, i.e., to extend benefits rather than to deny them, and should, therefore, only be subject to "rational basis" rather than "strict scrutiny" analysis. *See San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Education is not explicitly guaranteed by

the Constitution and is not considered to be a fundamental right. *Id.* at 35, 93 S.Ct. at 1297. If strict scrutiny were to apply, however, providing an integrated education has been described as perhaps the most important function of government and satisfies the requirement that the official action further a compelling state interest. *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

■ Courts have acknowledged that race may legitimately be considered in a school board's decision to further its policy that an ethnically balanced school setting is important to education. *See Swann v. Charlotte-Mecklenburg,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586; *McDaniel v. Barresi,* 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971); *Offermann v. Nitkowski,* 378 F.2d 22, 24 (2d Cir.1967).

There has been no showing that the trustees' plan redrawing attendance zones had either a discriminatory motive or a discriminatory impact on minority students. The parties agree that both Lee and Sterling High Schools provide a good education. The plan adjusted geographic attendance zones within the school district to develop a more equal ethnic balance at the two schools, and it did not transfer only certain students according to ethnicity or race. Students are assigned to one of the high schools according to their residence in that school's attendance zone. As stated, there is no constitutional right to attend a particular school, and there has been no showing that any reclassified students are being deprived of equal educational opportunity.

Nor does the record support the appellants' contention that the plan has no rational basis. There was evidence that recent demographic changes had concentrated Hispanic residents and low-income families in the southern part of the district and that geographic limitations had otherwise caused a development shift to the north. There was evidence that these factors would affect the racial and ethnic composition of the two high schools more significantly in the future, causing an expected higher concentration of Hispanic students at Lee.

There was testimony that the trustees studied various alternatives to prevent future de facto segregation or ethnic isolation in the schools; the rezoning plan finally adopted was the least disruptive, because it moved the fewest students, had the lowest transportation cost, and had no foreseeable adverse effect on the district's educational program. Two public hearings were held on these issues. The trial court found that though ethnic balance was the trustees' chief motive in redrawing attendance zones, they were also concerned with socioeconomic factors, achievement test scores, and course offerings. The record as a whole demonstrates that the plan adopted was substantially related to the trustees' purpose of assuring ethnic balance in district high schools, and was not, as appellants assert, "arbitrary and capricious."

■ The contention that constitutional due process required that the appellants be given individual hearings to contest the "transfer" of their children to another school is also without merit. The appellants have not shown an infringement of a liberty or property interest. *See Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Students have no constitutional right to attend a particular school. *See McDaniel v. Barresi,* 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582; *Broussard v. Houston Independent School District,* 395 F.2d 817, 821 (5th Cir.1968). The appellants have not shown a constitutionally protected interest entitling them to due process hearings. Points of error one, two, three, and seven are overruled.

Next, the appellants contend that the redrawing of attendance zones to achieve racial and ethnic balance violates state law. They emphasize in their brief that they do not contest the power of a Texas school board to periodically adjust the attendance zones of schools in order to accommodate changing population demographics, but they do contest this action if based only on considerations of ethnicity.

■ The Texas Education Code vests broad power in the board of trustees of an independent school district. Section 23.-26(b) of the Code provides that the trustees shall have the exclusive power to manage and govern the public free schools of the· district. Tex. Educ. Code Ann. (Vernon 1972). The appellants acknowledge that the trustees have general power to set attendance zones. Courts will not interfere with school trustees in the exercise of their broad powers of control and management unless a clear abuse of power and discretion is shown. *Nichols v. Aldine Independent School District,* 356 S.W.2d 182, 185 (Tex. Civ. App.—Houston 1962, no writ); *Kissick v. Garland Independent School District,* 330 S.W.2d 708, 710 (Tex. Civ. App.—Dallas 1959, writ ref'd n.r.e.).

■ The appellants contend specifically that sections 21.074 and 21.075 of the Texas Education Code prohibit the trustees' action. Section 21.074 permits the trustees of any school district to transfer and assign any pupil or pupils from one school or classroom to another within its jurisdiction. It also provides that such transfers not be made by a general or blanket order, but rather on an individual basis, taking into consideration the factors listed in section 21.075. Section 21.078 requires that a hearing be afforded upon receipt by the board of a petition stating objections to the assignment of a pupil to the school to which he has been assigned.

The trustees called as an expert witness Mr. Robert Howell, the supervising attorney for the Office of General Counsel, Texas Education Agency. Mr. Howell testified that he often was required to render opinions on the agency's position on education laws and policies; that he advises school districts about their legal responsibilities; that he responds to inquiries involving school law from either school districts or the general public; and that the agency is responsible for ensuring that school districts and educational entities in Texas comply with all state and federal laws, as well as their own internal rules.

Mr. Howell testified that there is a difference between a "transfer" and a "rezoning" in the administration of public education in Texas. He stated that a rezoning involves a territorial restructuring of the school district that may or may not involve transfers of students. A "transfer," on the other hand, involves a change in attendance of one student to one facility or to a classroom, or to a different school building within a school district. Mr. Howell described rezoning as a geographical issue, transfer as a "people issue." Though a change in geographical boundaries affects the residents of the area, Howell explained that rezoning really means "taking an area and making it belong to another educational entity ... [students] are not transferred out of one area that they belong to and have a right to attend into another which it is questionable whether or not they have a right to attend." This distinction was affirmed by another witness, Mr. W.C. Herring, a retired school administrator with experience in teaching and school administration since 1939.

Mr. Howell further stated that the Texas Education Agency heard cases concerning the rezoning of school attendance boundaries and that he could not recall that the issue of whether sections 21.074 and 21.075 applied had ever arisen. He further testified that, in his opinion, those sections were not applicable where a school district had rezoned its boundaries. Though Howell had never encountered a zoning plan similar to the instant one, which contains "pocket" zones rather than a contiguous zone, he stated that his answer would not be different for such a plan.

We find the distinction between a "rezoning" and a "transfer" to be persuasive. We hold that the trial court correctly decided that sections 21.074 and 21.075 of the Texas Education Code do not apply to the facts of this case. Thus, section 21.078 did not entitle the appellants to separate hearings to contest the alleged transfer of individual students under the rezoning plan. Points of error four, six, and eight are overruled.

In view of our holding that sections 21.-074 and 21.075 do not apply here, we do not reach point of error five, challenging the lower court's finding that those sections are unconstitutional.

The judgment of the trial court is affirmed.