Geneoveva **MORALES**, as next friend of Daniel Morales, a minor, et al.

v.

E. P. **SHANNON**, Individually and as Principal of Robb Elementary School, Uvalde County, Texas, et al.

Civ. A. No. DR–70–CA–14.

United States District Court,
W. D. Texas,
Del Rio Division.

Feb. 13, 1973.

Order Aug. 16, 1973.

Pat Maloney, San Antonio, Tex., for plaintiffs.

Grant Cook, Reynolds, White, Allen & Cook, Houston, Tex., for defendants.

## MEMORANDUM OPINION

JOHN H. WOOD, Jr., District Judge.

This action is brought by a Mexican-American [1] parent residing in the Uvalde Independent School District ("School District") as a class action on behalf of her children and all of the other Mexican-American school children enrolled in elementary schools in the School District. The plaintiff claims that the Mexican-American elementary school pupils in the School District have been and are presently subjected to discrimination in the educational process

1. The characterization "Mexican-American" has been used by the parties in their pleadings and proof in reference to persons with Spanish surnames. For convenience, the Court will use such term in the same context in this Memorandum Opinion.

and are thereby being denied an equal educational opportunity in violation of the Fourteenth Amendment to the United States Constitution and the Civil Rights Act ·of 1964 [42 U.S.C. Sec. 2000d]. She seeks equitable relief, apparently by way of a remedial decree calling for what is commonly known as a "desegregation plan", money damages and attorneys' fees. Subsequent to the filing of this suit, an administrative proceeding was instituted against the School District by the Department of Health, Education and Welfare seeking to terminate all federal financial assistance to the District. A few weeks prior to the trial of this case, a hearing was held in those proceedings, and the parties here have, by agreement, submitted to the Court as part of the record in this trial the voluminous transcript of those proceedings which has been carefully reviewed together with the other evidence presented at this trial.

The essence of the plaintiff's Complaint is that Mexican-American students are, by the attendance zoning plan of the School District, partially segregated from their Anglo counterparts at the elementary grade level; that the English language deficiencies of the Mexican-American elementary school students have not been adequately dealt with by the School District; and finally, that the School District has discriminated against Mexican-American applicants for faculty and administrative positions by its failure to employ them in greater numbers.

## FACTS

The Uvalde Independent School District includes within its boundaries all of the area of the town of Uvalde, Texas, as well as a substantial area surrounding the town, which has been generally referred to as the rural portion of the School District. It operates one (1) high school, one (1) junior high school, four (4) elementary schools and a location for kindergarten students. The School District has a total scholastic enrollment of approximately 3,853 students of whom 61% are Mexican-American, 38.6% are Anglo and .4% are Negro. The City of Uvalde is divided roughly into four quadrants by U.S. Highway 90 running in a generally east-west direction and State Highway 55 running in a generally north-south direction. The intersection of those two main thoroughfares is located at the approximate center of the town. The four elementary schools are located basically within the four quadrants of the town, roughly equidistant from the center of town defined by the intersection of those highways. Uvalde is a fairly old town by South Texas standards, the School District having been originally organized in 1907. Prior to that time the children of the area were apparently educated in various separate school facilities scattered around the county. The present high school building was constructed in 1963; the junior high school (being the original high school) in 1929; and the elementary schools in 1937 (Benson), 1954 (Dalton and Robb) and 1966 (Anthon). The ethnic composition (disregarding the miniscule percentage of Negroes) of the individual elementary schools is: Dalton—35% Mexican-American; Benson—55% Mexican-American; Anthon—98% Mexican-American; and Robb—97% Mexican-American; approximately 68% of all elementary students are Mexican-American. The faculty ethnicity (Mexican-American) is approximately: High School—20%; Junior High School—10%; Robb Elementary —9%; Dalton Elementary—6%; Benson Elementary—10%; and Anthon Elementary—14%. The adult population, according to the 1970 census of the community, is approximately 60% Mexican-American.

There is no evidence that the School District has ever operated more than one high school or junior high school (with the exception of separate facilities for Negroes pursuant to State law prior to 1955). The student assignment plan presently in use is a zone plan which presents the classic neighborhood school concept in that the zone lines were fairly

and reasonably drawn to encompass the residential areas surrounding the various elementary schools. In that connection, the Court specifically finds that those boundaries were originally drawn in 1966 in an effort to place the elementary school students nearest their homes, consistent with the capacities of the various schools, natural barriers, major thoroughfares and the like. Prior to the 1965–66 school year, there were no zones for any students in the District and any elementary student could attend any elementary school. The Anthon elementary school, the newest school in the system, was opened in September, 1966. The site selected for that school was chosen after a lengthy study and investigation by the school officials in connection with assistance from the Texas Education Agency. That school site and the zoning plan which ultimately resulted was enthusiastically approved and endorsed by that State Agency. Prior to the opening of the Anthon elementary school, the School Board appointed a committee of an equal number of Anglo and Mexican-American members to make a study and recommendation to the District as to the best method to be utilized in the assignment of students in view of the opening of the new elementary school. The committee ultimately recommended that a survey be taken of all of the parents in the District to determine which of the four elementary schools they would select in the coming year in which to enroll their children. The results of that survey were that most of the Mexican-American parents selected Robb School (which had had the highest percentage of Mexican-American theretofore) of the three schools previously in operation and a very low percentage of people, both Mexican-American and Anglo, indicated a choice for the new elementary school (Anthon). The bi-ethnic committee went on to recommend that if the results of the survey projected an imbalance among the four elementary schools in relationship to their capacities, a zoning plan should be devised in order to place the elementary students in the school nearest their homes. Thus, the zoning plan came into being beginning with the 1966–67 school year. The zone lines originally established in 1966 have never been changed. No effort was or has been made to zone the elementary students residing in the rural portions of the District who ride the school busses. Instead, those children, who are the only ones who ride busses, were allowed to continue in a freedom of choice plan, subject to the capacity of the elementary schools, and this system is still in effect with the exception that bussed students from the rural areas cannot attend Benson elementary school by reason of overcrowding. Only about 7% of the total enrollment ride busses and the cost is borne entirely by the State as opposed to the District. The eligibility of the students to be transported is determined in accordance with State regulations on the basis of the distance of that child's home from the nearest school. Approximately 59% of the students presently riding busses are Mexican-American and 41% are Anglo.

As noted above, the Dalton and Robb elementary schools were constructed and opened at the same time. Additions have been made to both schools from time to time since their construction in 1955. They are substantially identical in physical characteristics. Prior to their opening, the District operated only two elementary schools: the present Benson school, which is located just north of the center of town, and the West Garden elementary school, which was located very near the center of town. The West Garden school was abandoned at about the time that Robb and Benson were opened because of its age and condition. The Dalton school was located in the northeast quadrant of the District, which is the area in which almost all of the new residential subdivision activity was then taking place. That area is a predominantly Anglo area. The Robb school was located south of the center of town in a densely populated Mexican-American residential area. The residential separation of the

Mexican-American and Anglo residents of Uvalde is quite clearly defined, with almost all of the Mexican-Americans living in the central, southern and southwestern portions of the town, and the Anglos living in the north and northeastern portions. The ethnicity of the elementary schools reflects the ethnic breakdown of the various school zones.

## STUDENT ASSIGNMENT AND NEIGHBORHOOD SCHOOLS

I find no evidence of discriminatory intent, past or present, in the assignment of pupils to the elementary schools in the District. It is undisputed that two of the four elementary schools have more than 90% Mexican-American enrollment, as compared to the fact that 68% of all of the elementary students are Mexican-American. While it is true that the locations of the elementary schools were selected by school officials, I find no discriminatory intent on the part of the District in making those selections nor in the designation of the attendance zones. The evidence is clear that the selection of sites and the location of attendance zones was done on an ethnically neutral, non-discriminatory basis; the object being to construct and maintain a true neighborhood school concept, whereby the schools are located in such a way as to be most readily accessible to the children and their parents.

The appointment of the bi-ethnic committee to study the school assignment problem and the subsequent survey conducted of all parents amply demonstrates that the District made every effort to assiduously avoid a discriminatory motive, policy or result in the plan finally adopted.

■ The objective of establishing a true neighborhood elementary school concept in Uvalde, the locations of these schools in neighborhoods of ethnic concentration, and the designation of school zones reflective of the residential ethnic pattern are not in and of themselves evidence of discriminatory intent on the part of the District to construct and

maintain an ethnically segregated system in light of other factors which must be weighed and considered. Foremost among the considerations which evidence a dearth of discriminatory motive is the inescapable fact that Uvalde operates only one high school and only one junior high school attended by *all* students in the District. If discrimination, segregation, or ethnic isolation were the District's purpose, as the plaintiff would have us believe, the prima facie evidence preponderates to the contrary. Certainly this Court would be suspect of a District's intentions where the evidence indicated a continuing ethnic segregation throughout the entire system (from elementary to senior high school). However, where, as here, the only possible logical inferences which can be drawn from the plan indicate a concern by the District that its pupils of a young and tender age be educated in close proximity to their homes, families and friends. Upon attaining a degree of maturity, the umbilical cord of the neighborhood school concept is severed and all students are combined under one roof. To impute a discriminatory purpose to such an elementary school plan, without regard to the realities found in the junior and senior high schools, would be tantamount to a science class studying the planet Earth without considering its relation to the solar system. This Court will not accept so narrow a scope to determine discrimination.

■ At the time these elementary schools were constructed (1939, 1955 and 1965) and at the time these zone lines were designated (February, 1966) no Court had ever held that, as a matter of constitutional duty, a school district is required to take affirmative action to bring about the integration of Mexican-American students in Texas with Anglos and others. Until recently, no Court had held that the mere fact that Mexican-American students against whom no discrimination had previously been practiced by mandate of State law and who were found to be concentrated in one or more schools, gave rise to any obligation

on the part of the School District or authorized a Federal Court to restructure the method of student assignment in the District, whereby racial imbalance would be eliminated. The first such holding amounting to a monumental departure from precedent made by any Federal Court was in 1970 in the District Court Opinion in Cisneros[2], and the first time any Appellate Court so held was the Fifth Circuit's decisions in Cisneros v. Corpus Christi Independent School District[3], and United States v. Texas Education Agency (Austin Independent School District)[4], both decided the same date, August 2, 1972. It has been previously held by the Fifth Circuit in Broussard v. Houston Independent School District[5] that no relief will be granted against a school district in a desegregation case by reason of actions taken by it which, at the time, had not been disapproved by a Court but were, after the fact, held to be violative of constitutional principles. The Broussard Opinion brings this distinction sharply into focus. There the Houston School District embarked upon a multi-million dollar school construction and renovation program and, admittedly, did not consider race as a factor in the selection of new school sites and in the selection of old school buildings to be renovated and modernized. A suit was brought to enjoin the building program on the basis that the sites selected for new school construction and the old school buildings singled out for renovation were, in many instances, located in areas of the district populated substantially or entirely by Negroes and, therefore, the net result of the new program would be to enforce and maintain a segregated school system. The Trial Court in the Broussard case in July, 1966, denied the injunctive relief observing that there was no judicial authority which required the district to affirmatively

consider race as a factor in a building program, or to affirmatively bring about the integration of the races in the system, as opposed to its duty to refrain from segregating them. Six months later, the first Jefferson[6] opinion was issued by the Fifth Circuit, and in March, 1967 the Fifth Circuit en banc[7] ratified the original decision. Thereafter, the Fifth Circuit decision in the Broussard case was issued. The majority there observed that the Jefferson opinion for the first time clearly imposed the obligation on the school district to affirmatively consider race and the effect upon the desegregation process in selection of building sites and in carrying out a building program, and furthermore that the constitutional obligation of the school district did not stop with the negative command not to segregate, but instead required affirmative action on the part of the district to integrate. The majority in the Broussard case nonetheless refused to apply Jefferson retroactively and upheld the Trial Court's denial of the injunctive relief designed to bring a halt to the building program. Judge Wisdom, in an extraordinarily vigorous dissent, pointed out that since the District Court Opinion in Broussard the Fifth Circuit had not only pronounced the Jefferson opinion, but had likewise decided a number of other cases holding that race must be affirmatively considered by school districts undergoing the desegregation process in connection with their building and renovation programs. In a somewhat unusual "Supplemental Opinion" by the author of the majority opinion (Judge Ben Connally), in response to Judge Wisdom's dissent, the author of the majority opinion stated:

"What is at issue here is whether this $59 million construction program, planned, financed, and begun long before the controversy giving rise to

2. Cisneros v. Corpus Christi Independent School District, 324 F.Supp. 599 (D.C.Tex., 1970).

3. 467 F.2d 142 (5th Cir., 1972).

4. 467 F.2d 848 (5th Cir., 1972).

5. 395 F.2d 817 (5th Cir., 1968).

6. United States v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir., 1966).

7. 380 F.2d 385 (5th Cir., 1967).

*Jefferson* had matured, and while that opinion, which ultimately became the law of this Circuit, lay dormant in the heart of its author, should be enjoined as contrary to *Jefferson* . . . Admittedly, the Houston School authorities did not affirmatively consider this factor, but followed the practice, *then sanctioned both by law and custom,* of selecting sites which would best serve the needs of all of the scholastics of the district . . . The question then is whether a court of equity should enjoin a program of this magnitude, well under way, because the school authorities were not endowed with sufficient prescience to anticipate *Jefferson* by some two years. We would answer in the negative." (Emphasis added.) 395 F.2d 817 at 829.

Likewise, I believe, that the selection of school sites and the designation of attendance zones in this case, having been done without any intent on the part of this School District to discriminate against Mexican-Americans or to deny to them the right of equal educational opportunity, cannot serve as the foundation of a retroactive finding of a constitutional violation; the school authorities not being "endowed with sufficient prescience to anticipate" *Cisneros* and *Austin* by forty-three, ten or four years. If, of course, the evidence showed that the site selection and the attendance zone designations had been undertaken by the school authorities with the intent to discriminate against the Mexican-Americans and/or to maintain a segregated school system regardless of past law or custom, the result would be to the contrary. However, not only has the plaintiff failed to produce any persuasive evidence to establish that fact, but the School District has conclusively proved to the satisfaction of this Court that no such intent, past or present, existed.

## NUMERICAL IMBALANCE

■ Plaintiff contends that the existence of two of the four elementary schools with more than 90% Mexican-American scholastic population, in and of itself, requires the desegregation of the District. It has already been stated hereinabove that the Court finds no intent on the part of the School District to deny equal educational opportunity to Mexican-American students and that the existence of those two elementary schools with high Mexican-American percentage populations is the result of residential neighborhood patterns within a school district which has been operated and maintained on a neutral, non-discriminatory basis. The numerical imbalance in two of the elementary schools, standing alone, is not persuasive on the Court. In Swann v. Charlotte-Mecklenburg Bd. of Education [8], the most recent comprehensive pronouncement of the Supreme Court in the field of school desegregation, the Court held:

"If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, *that approach would be disapproved and we would be obliged to reverse.* The constitutional demand to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." (Emphasis added by the Chief Justice.) 402 U.S. at 24, 91 S. Ct. at 1280.

As if the foregoing language were not sufficiently clear, the Chief Justice reemphasized the concept set forth in it in a subsequent Memorandum Order in Winston-Salem/Forsyth County Board of Education v. Scott;[9] where, with specific reference to the passage from the *Swann* opinion quoted above, the Chief Justice stated:

"The Board's resolution citing that it was adopting the revised plan under

8. 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

9. 404 U.S. 1221, 92 S.Ct. 1236, 31 L.Ed.2d 441 (1971).

protest, on an understanding that it was *required* to achieve a fixed 'racial balance' that reflected the total composition of the school district is disturbing. It suggests the possibility that there may be some misreading of the opinion of the Court in the *Swann* case. If the Court of Appeals or the District Court read this Court's opinion as requiring a fixed racial balance or a quota, they would appear to have overlooked specific language in the opinion in the *Swann* case to the contrary." (Emphasis added.) 92 S.Ct. 1236 at 1240.

Accordingly, in line with what I believe the Supreme Court has said in *Swann* and reaffirmed in *Winston-Salem,* I hold that it is not a necessary ingredient to a unitary school system that all schools substantially reflect the racial balance of the school community as a whole.

### FACULTY

With respect to faculty, plaintiff points to the fact that only about 20% of the faculty is Mexican-American, whereas more than one-half (½) of the pupils are Mexican-American, and from those figures concluded that the District has discriminated against Mexican-Americans in its hiring policy. The evidence, however, is to the contrary. While the School District has made some efforts to actively recruit Mexican-American faculty, particularly in more recent years, the number of Mexican-American applicants for teaching positions has remained drastically low. However, with only one exception, the School District has, since the 1964–65 school year (which is the earliest date for which statistics were made available to the Court), employed a proportionately greater number of Mexican-American teacher applicants than it has Anglo applicants. For instance, for the 1971–72 school year, the District employed approximately 60% of the Mexican-American applicants and only 30% of the Anglo applicants. Evidence in this case further revealed that every Mexican-American applicant who was denied a job was refused for a valid reason (i. e. no positions available, lack of qualifications, etc.) and not because of any discriminatory purpose. I find no evidence of discrimination against Mexican-Americans in the hiring or promotion practices of the School District in dealing with its faculty; on the contrary, the District is affirmatively seeking more Mexican-American teachers. Two of the Mexican-American administrators in the District testified at the trial; their testimony even further reinforces the Court's belief that there has been an absence of discrimination in connection with faculty in the School District.

### BI-LINGUAL BI-CULTURAL EDUCATION

The plaintiff furthermore claims that Mexican-American elementary school students are being denied an equal educational opportunity by the School District because the District is not, in the plaintiff's view, adequately overcoming the English language deficiency which most of the Mexican-American children bring with them upon entry into the school system. This issue was the principal thrust of the Government's case in the administrative proceeding brought in the Department of Health, Education and Welfare against this School District. The District does not deny that a substantial proportion of the Mexican-American children entering kindergarten or first grade, as the case may be, suffer from a deficiency, in one degree or another, in their mastery of the English language. In an effort to overcome that deficiency and to compensate for it, the District has, for several years, operated principally two programs which are primarily financed by Federal financial assistance: "Head Start" and "Follow Through". The Head Start Program, designed to benefit children from the lower economic strata of the community, deals with pre-school children. The Follow Through Program is designed to continue the help given in Head Start to children in the first three grades. The School District contends that the Follow Through Program has been successful in

large measure and the Court so finds. The plaintiff, however, would prefer to see the District operate a program which is described in this record as a bi-lingual program. This type program, as understood by the Court from the testimony given at the trial of this case, as well as from the testimony in the administrative proceeding, differs from the program now being used by the School District, basically in that the District's program has as its principal goal the education of the children in the English language and the inculcation of an English language oriented education. On the other hand, the bi-lingual program, as described by the plaintiff's witnesses, is intended to "reinforce the Spanish speaking ability of the student while, at the same time, develop English as a second language" and preserve and "reinforce" Mexican culture and traditions.

While this Court has an opinion, without benefit of educational expertise, upon the relative merits of such programs, I do not attempt to pass upon them. This reluctance is based upon the fact that these are educational and/or sociological issues, but not constitutional issues. The testimony before the Court as well as that at the H.E.W. hearing indicate that there are widely differing and conflicting viewpoints as to the efficacy of bi-lingual and bi-cultural programs in general and to the various types of programs in particular which best serve the purpose. Expert educators cannot agree among themselves and certainly many of the plaintiff's witnesses, critical of the existing programs who did not qualify as experts, testified only as to their subjective, unsubstantiated opinions. The Court has not been persuaded by this testimony and would not be so presumptuous as to assume expertise and impose upon the District a program governing this type of education.

■■ Neither the Mexican-American child, the French-American child, the Italian-American child, the Chinese-American child nor any other of the conceivably hundreds of national origin groups are entitled, as a matter of substantive constitutional right, to a program of education which utilizes as the medium of instruction the language of the country of their origin or of the origin of their forebearers. If the Mexican-American children in Uvalde are entitled to receive such an educational program, what of the German-American children in localities such as Fredricksburg, Texas, which has a high percentage of children of German ancestry or of any of the other hundreds of cities and towns in this Country that are populated predominantly by persons with Dutch ancestry, Irish ancestry, Italian ancestry or the like? To impose, as a constitutional duty, the burden upon a school district to obtain school teachers who are proficient in the language and culture of any foreign national origin school child who wishes to assert this claimed constitutional right would not only be intolerable from a practical standpoint, but would be ludicrous from a theoretical standpoint when carried to its logical extreme. The Court has already borne witness to this theory carried to extreme where in this very case certain German-Americans, through a party defendant, Gordon L. Erkfitz, requested the teaching of the German language and German customs by German teachers, and the serving of traditional German food in the school cafeterias. By Order of this Court entered April 5, 1971, this cause was terminated by a Final Judgment of Dismissal. Constitutional rights are individual rights and not group rights. The rights of a group under the Constitution are not different from the rights of the individual members of the group. Majority rule is an aspect of democracy, but cannot and should not be confused with fundamental Constitutional rights. Accordingly, the fact that the majority of the students in the Uvalde School District are Mexican-American does not grant them any greater claim to a right to a bi-lingual educational program than if there were but one in the entire District.

■ Together with plaintiff's attack on the bi-lingual programs existent in the District, plaintiff also alleges that the class assignment of students to regular and special education classes serves to deny an equal educational opportunity to the Mexican-American pupil. The evidence revealed both at the H.E.W. hearing and before the Court that the School District had abandoned its class assignment of students based on ability groupings (assignment based on previous grades, testing scores, etc.). The new class assignments are based solely on objective, numerical and alphabetical data so that each class contains a random sampling of all students within each grade. Such a process does not redound to a denial of equality in education. Furthermore, the fact that a disproportionate number of Mexican-American students are assigned to certain Special Education classes for students with learning disabilities does not indicate a denial of equal educational opportunity. The plaintiff alleges that certain students are thus assigned solely due to their English language deficiency and that their education is retarded as a result. Once again, the school's method of coping with English language learning by those students who cannot adjust simply by virtue of the Head Start and Follow Through Programs and need special attention is not the province of this Court where no discriminatory intent is indicated. In passing, it should be noted that Mexican-Americans are not the sole students in Special Education classes— 100% of the students in the Emotionally Disturbed classes are Anglo-Americans.

The question of a School District's failure to provide non-English speaking students with special compensatory instruction was met head-on by the Ninth Circuit Court of Appeals in an, as yet, unreported decision in Lau v. Nichols, 483 F.2d 791 (9th Cir. 1973, Dissent, Hill, J.). There the Court held in a class action by Chinese students in the San Francisco School District that the plaintiffs extreme reading of Brown v. Board of Education of Topeka, etc., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) that the district had an affirmative duty to provide special assistance to overcome a student's language disabilities was not an acceptable or proper interpretation. As in the case at Bar, the California Court found that there had been no affirmative discriminatory action by the School Board; that English used as a language of instruction did not evince discrimination; and that the Board's actions did not perpetuate the ill effects of any past de jure segregation. Judge Trask, speaking for the Court, held that the School Board's responsibility to Chinese speaking students under the Equal Protection Clause extends no further than to provide them with the same facilities, text books, teachers, and curriculum as are provided other children in the district. The opinion also holds that the determination of what special educational difficulties are to receive curative action is a decision for executive and legislative expertise and *non-judicial* value judgments, which must be reconciled with the finite resources available to meet the need. This Court agrees with the reasoning of Judge Trask and the majority of that panel, and finds the facts and law both analogous and applicable to the instant case.

I make this holding in full awareness of a recent District Court Memorandum Opinion in Serna v. Portales Municipal Schools decided by the United States District Court in New Mexico during the trial of this case, 351 F.Supp. 1279 (1972). There the Court held that Mexican-American students were entitled, as a matter of substantive constitutional right, to be educated in public schools utilizing a bi-lingual-bi-cultural program. The *Serna* decision is the first opinion of any Federal Court to so hold. The Court cited not one judicial authority to support such a conclusion that the Fourteenth Amendment compels such result. I do not feel constrained to follow that decision of another District Court and specifically decline to do so.

■ In weighing the testimony and evidence previously presented to the H.

E.W. and made a part of this record, as well as that now before the Court, several observations are worth mentioning. In the first place, the fact that the School District rebuffed the offers of special assistance from H.E.W. in solving the District's "problems" is not considered by the Court as evidence of bad faith, nor of actual or intentional discrimination. Furthermore, the evidence presented before the H.E.W. examiner as to the effect of classroom assignment based on ability grouping has now been discarded as previously discussed and was primarily offered to show alleged unequal educational opportunity extending from this original elementary class assignment through junior and senior high schools. The problems, if any, of the Uvalde Junior and Senior High Schools are not before this Court and the effects of the abandoned assignment program at the elementary level are now moot and, therefore, have not been considered by the Court.

It is also noteworthy to point out that the witnesses presented by the plaintiff did not represent the Mexican-American students of the District as a whole, but rather were an organized body of dissatisfied parents and teachers who had formed as a group for the purposes of this law suit and other Mexican-American political and civil-rights oriented causes. In fact, the evidence indicated that there were a substantial number of students and parents who were not in complete accord with the allegations of the plaintiff. The testimony of these witnesses must be considered in light of their self-interest in the outcome of this case. Several witnesses were school teachers who either were teaching or had taught in the District. It is apparent to the Court that the majority of their testimony was based on subjective observation and opinion without any expertise regarding proper school administration or policy and wholly unsubstantiated facts and statistics. One such witness was in fact the plaintiff in a companion case involving his dismissal by the District which was pending at the time of this trial. The plaintiff herself testified as to her childhood impressions of the early District's administrative policies and the current problems she was encountering with her various children in the current school situation. All of the evidence, when compared with that of the professional school principals and administrators with factual explanations of the School District's motives, policies and procedures, suffers by comparison. This is also true of much of the testimony in the H.E.W. record, wherein it was shown that the H.E.W. investigating team made a most cursory review of the District and in several instances misinterpreted data relating to student testing and evaluation. The layman testimony and the apparent weaknesses of the H.E.W. investigation, when confronted by the defendant School Board's witnesses and evidence, are not of the caliber and weight this Court finds persuasive in order to rule in plaintiff's favor.

■ Accordingly, it is the conclusion of this Court that the plaintiff's complaints with respect to the existence of English language deficiencies on the part of many of the Mexican-American students and the claimed failure of the School District to deal with them, even if it had so failed, would not and does not amount to a denial of equal educational opportunity protected by either the Fourteenth Amendment or the Civil Rights Act of 1964.

## BUSING PLANS

■ Plaintiff, as part of the relief requested, would have the Court dismantle the present attendance zone scheme and rectify the ethnic imbalance among the four elementary schools (grades one through six). To accomplish this end and to ameliorate the ethnic disparity, particularly as regards the Robb and Anthon schools, plaintiff advocates the massive public transportation of students or in the alternative the institution of the so-called "pairing" system.

While tools such as these have been employed and approved by various

Courts to accomplish school desegregation, the use and efficacy of such plans are matters of great concern to this Court in light of their ultimate effect on the students themselves, the financial considerations, and the educational quality of the District.

In the Uvalde School District, the evidence revealed that a busing plan would result in serious financial hardships. At present, some 280 elementary students who reside beyond a two mile radius from their school are entitled under State law to free public transportation. The District provides 13 busses on 11 regular routes for the transportation of all 700 elementary and secondary level students. Under a busing or pairing plan, about ¾ths or 1500 elementary students would require transportation. The District would have to provide approximately 18 additional buses. Aside from the purchase cost, the operating costs per bus per school year would be about $3,000. It would cost the District over $200,000.00 in the first year alone for such a plan. This figure represents slightly less than 10% of the District's entire budget.

As can be seen from the facts and figures above, such a financial commitment for busing would indeed be an onerous and unwarranted burden on the District and its taxpayers. The Court is further concerned that the yearly busing costs, when extracted from the total school budget, may well diminish the quality of education by necessitating the elimination or reduction of various educational programs and materials to financially compensate for busing. This prospect is particularly strengthened by the recent budgetary cutbacks by the Government in Federal funding in the educational field.

The repercussions of a busing plan would be magnified many times in a small rural District such as Uvalde where the community would be hard pressed to initially finance and maintain such a plan, as opposed to a large densely populated urban District with its vast resources. The population of Uvalde County consists largely of Mexican-American low-income agricultural laborers upon whom another tax burden would no doubt prove crushing.

In view of the fact that the Court has found no intentional actual discrimination by the District, it is anticipated that there will be no necessity to fashion any type of remedial plan. However, because a Final Judgment will not be entered in this case pending a relevant decision by the Supreme Court, as discussed infra, it may be that the Supreme Court will require active desegregation in cases such as this. Should this be the Supreme Court mandate, it is hoped that the aforementioned analysis of the solution posed by the plaintiff will shed some insight into the crucial problems facing the District and those areas which are of vital concern to the Court.

### THE PROBLEM

Having found on the facts of this case an absence of discriminatory intent against Mexican-American pupils, but at the same time ethnic isolation of some of the Mexican-American pupils at the elementary level, the Court must now turn to the legal consequence of such findings. In the cases concerned with integration of Negro students, the question of discrimination, *vel non*, in the first instance, has not been significant because the cases arose in States that admittedly discriminated against Negroes by laws requiring separate educational facilities for the races. However, there has never been a law in Texas requiring separate educational facilities for Mexican-American students. This Court recognizes certainly that in the absence of statutorily compelled segregation, a school district can nonetheless be subject to a desegregation decree if it, or some other arm of the State, has practiced invidious discrimination against any particular ethnic or racial group in the assignment of pupils to schools or in any other facet of the educational program. The question remains, however, in the case of Mexican-

Americans against whom no statutory discrimination in education has been practiced, why are they found to be isolated in certain schools in a school district such as Uvalde and what is the effect of such finding? Are they there because of discriminatory treatment by the school authorities or are there other reasons for this separation? This raises the basic legal question in this case: Must I find that the ethnic isolation which exists in two of the elementary schools in Uvalde was established by this School District's discriminatory treatment of the Mexican-American students (intent to segregate and/or deny equal educational opportunity) in order to grant the relief sought here by the plaintiff?

A careful analysis of the most significant decision of the United States Supreme Court [10] and those of the United States Court of Appeals for the Fifth Circuit [11] on this issue leads this Court to definitely conclude that the decisions of the Supreme Court and those of the Fifth Circuit in this area are squarely conflicting, as are those Fifth Circuit decisions with other Circuits.[12]

## THE FIFTH CIRCUIT AND SWANN

The conflict between the Supreme Court and the Fifth Circuit at first blush appears to be merely one of semantics, but an in-depth analysis of the opinions shows the conflict to be firmly rooted in contrary beliefs of those Courts concerning substantive constitutional rights and obligations.

The semantical difficulty I perceive with the Fifth Circuit opinions in *Austin* and *Cisneros* is that Court's apparent interchangeable use of the terms "discrimination" and "segregation", whereas the Supreme Court in *Swann* was more precise in its handling of those terms. A side-by-side analysis of those opinions readily reveals the discrepancy; the Supreme Court holding that discrimination, in the establishment of a dual system, must be proved to invoke the equitable powers of the Court in these school cases and the Fifth Circuit holding that ethnic isolation, standing alone, is sufficient to require the dismantling of a school district.

From the following passage it seems clear that even when considering Green v. County School Board of New Kent Co., Va., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), from which the "root and branch" language has grown to sequoian proportion through the careful grafting of new branches, one must keep in mind that the Supreme Court refers to State compelled dual systems evidencing intentional racial discrimination and *not* to de facto, non-compelled, unintentional segregation:

"Brown II was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multifacited problems would arise which would require time and flexibility for a successful resolution. School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." at pp. 437–438, 88 S.Ct. at p. 1694.

10. Swann v. Charlotte-Mecklenburg Bd. of Education, note 8, supra.

11. Cisneros v. Corpus Christi Independent School District, note 3, supra, and United States v. Texas Education Agency (Austin Independent School District), note 4, supra.

12. Keyes v. School District No. 1, Denver, Colorado, 445 F.2d 990 (10th Cir., 1971), cert. granted, 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972); Downs v. Bd. of Educ. of Kansas City, 336 F.2d 988 (10th Cir., 1964), cert. den., 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965); Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir., 1966), cert. den., 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967), also at 419 F.2d 1387 (6th Cir. 1969); Bell v. School City of Gary, Indiana, 324 F.2d 209 (7th Cir., 1963), cert. den., 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964); Springfield School Committee v. Barksdale, 348 F.2d 261 (1st Cir., 1965).

The following passages from the Supreme Court's Opinion in *Swann* clearly indicate to me that it is first necessary to find discrimination; i. e., intentional treatment of the particular ethnic group in a manner different from the treatment of the remainder of the school population, *before* the District Court is authorized to direct the implementation of a desegregation plan:

"In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a *constitutional violation* (invidious discrimination). Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary." 91 S.Ct. 1267 at 1276.

\*   \*   \*   \*   \*   \*

"To do this (strike a racial balance in all schools of a system) as an educational policy is within the broad discretionary powers of school authorities; absent a finding of *constitutional violation*, however, that would not be within the authority of a federal court." 91 S.Ct. 1267 at 1276.

\*   \*   \*   \*   \*   \*

"We do not reach in this case the question whether a showing that school *segregation* as a consequence of other types of state action, without any *discriminatory* action by the school authorities, is a constitutional violation requiring remedial action by a school desegregation decree." 91 S. Ct. 1267 at 1279.

\*   \*   \*   \*   \*   \*

" . . . they (school districts) have the burden of showing that such school assignments are genuinely *non-discriminatory*. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past *discriminatory action* on their part." 91 S.Ct. 1267 at 1281.

\*   \*   \*   \*   \*   \*

"Absent a *constitutional violation* there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of *discrimination*, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been *deliberately constructed and maintained* to enforce racial segregation." 91 S.Ct. 1267 at 1282 (Emphasis added.)

While the Court in *Swann* was dealing with an ethnic group that had previously been segregated in the educational process by State law, which is not the case here, it is apparent to me that the Court was there attempting to clearly define the limitations of the authority of Federal Courts in all cases dealing with claims of the denial of equal educational opportunity. It is highly significant to the determination of the law to be applied in this case that the Supreme Court has never written on the question of school segregation *not* brought about by the discriminatory action of school authorities or a State law requiring separate educational facilities for racial or ethnic minorities—that is, De Facto Segregation. Indeed, that specific question was reserved in the *Swann* opinion. Now, however, the Supreme Court has granted certiorari, heard arguments and now has under submission the *Keyes* case (note 12, supra) which presents that very question.

█ The Fifth Circuit wrote for the first time on the question of the desegregation of ethnic minorities against whom no State-imposed de facto segregation had previously been practiced under State law, in *Austin* and *Cisneros*. In the *Austin* case, the majority opinion paid munificent lip service to the concepts set forth in the foregoing quotations from Swann, which clearly require a finding of intentional discrimination, as opposed to segregation, racial imbalance, or ethnic isolation as the constitutional violation authorizing the District Court to implement its remedial judicial powers. On the other hand, in *Cisneros*

the Fifth Circuit clearly discarded any finding of discrimination, as opposed to segregation or ethnic isolation, as a predicate to the authority of the District Court to order a restructuring of a school district. The following pertinent passages from the majority opinion in *Cisneros* dramatically illustrate that Court's position on the matter:

"Thus, we discard the anodyne dichotomy of classical de facto and de jure segregation. 467 F.2d 142 at 148.

"We need only find a real and sufficient relationship, *in terms of cause and effect* between state action and the denial of educational opportunity *occasioned by the racial and ethnic separation* of public school students." 467 F.2d 142 at 148.

\* \* \* \* \* \*

"We affirm the finding of the district court that action by the school district here has, *in terms of cause and effect,* resulted in a severely segregated school system in Corpus Christi. We need find nothing more. *Discriminatory motive and purpose,* while they may reinforce a finding of effective segregation, are not necessary ingredients of constitutional violations in the field of public education. We therefore hold that the racial and ethnic *segregation* that exists in the Corpus Christi school system is unconstitutional—not de facto, not de jure, but unconstitutional." 467 F.2d 142 at 148–149.

\* \* \* \* \* \*

"The explicit holding of Cisneros I, which we now affirm, was that ac-

tions and policies of the Board had, *in terms of their actual effect,* either created or maintained racial and ethnic segregation in the public schools of Corpus Christi." 467 F.2d 142 at 149.

"The Board imposed a neighborhood school plan, ab initio, upon a clear and established pattern of residential segregation in the face of an obvious and inevitable *result*." 467 F.2d 142 at 149 (Emphasis added.)

As I read the *Cisneros* opinion, and particularly the foregoing passages from it, it seems clear to me that the Fifth Circuit is saying that if the school district does anything or fails to do something which has the effect of causing ethnic imbalance of Mexican-American students, this is all that need be found to authorize the District Court to order a desegregation plan. The Court's repeated reference to "cause and effect" obviously means that it believes that it is only the *result* of Board action or inaction that is of importance, not the *intent* with which the action was taken. Discrimination, by definition, involves intent to treat some differently from others. The Fifth Circuit is either saying, with respect to Mexican-Americans, that discrimination, *vel non,* is of no significance or that proof of discrimination is irrebuttably made upon a showing of ethnic or racial isolation in the school system. In this approach, gradually gravitated to in one opinion after another, the Fifth Circuit seems to pronounce as law the proposition that statistics are the predominant Platonic Form by which discrimination is shown.[13] I can-

---

13. The plaintiff depends heavily upon the proffered statistical evidence of racial imbalance in the enrollment in the elementary school system.

The Court should like to emphasize and make clear that the Uvalde elementary school system is not the typical situation. It is, rather, very much the atypical in that approximately 68% of all of the elementary school students are Mexican-American.

While not compelling, a comparison of the following typical, but hypothetical example is helpful in putting into proper perspective

the statistical evidence in the case before the Court.

Consider then the case where the ethnic minority in fact occupies a numerical minority position within the system as a whole where, for example, the minority to majority ratio in the system is 40% to 60% rather than the 68% to 32% in the Uvalde elementary schools.

The question is: How does the individual school's minority percentage figure relate to the elementary school system-wide minority percentage figure? The resulting figure

not square that rationale with the Supreme Court's opinion in *Swann* which clearly calls for a finding of intentional discrimination in the establishment of a segregated school system.[14]

While the Trial Court should meticulously review any school policy that might result in even de facto segregation, the de jure test of *Swann* cannot be ignored and the Trial Court should utilize its equitable powers only where a motive and intent to institute, preserve, or protect racial discrimination is shown.

To further complicate an understanding of the Fifth Circuit's position and to place it in perspective with that of the Supreme Court, the majority opinion in the *Austin* case made the following statement which, standing alone, squares with *Swann*:

"The power of the district court will depend first upon a finding of the proscribed *discrimination* in the school system. In determining the fact *discrimination, vel non,* whether imposed by statute or as result of official action, the District Court must identify the school or schools which are segregated as a result of such *discrimination*. This identification must be supported by findings of fact . . . . There may be *segregated* schools which are the result of unconstitutional statutes or of official action. There may be other one race schools which are the product of neutral, *non-discriminatory forces*." (Emphasis added.)   Citing *Swann,* 467 F.2d 848 at 884.

However, in the opinion with which the author (Judge Bell) of the foregoing statement concurred, the Court stated, after observing a disproportionate percentage of minority faculty as opposed to minority students, that:

"When the figure speaks so eloquently a prima facie case of *discrimination* is established." (Citing *Swann* again) 467 F.2d 848 at 873.

I find all of the statements quoted above from the *Cisneros* opinion to be totally at odds with the entire thrust of the *Swann* opinion, which holds that the Court is powerless to act absent a find-

will be an index for comparing the hypothetical with the case before the Court.   See Table A below:

TABLE A

| Uvalde Elementary School | School % age figure | Weighted Comparison figure for case at Bar | Weighted Comparison figure for hypothetical case |
|---|---|---|---|
| DALTON | 35 | 51.47 | 87.5 |
| BENSON | 55 | 80.88 | 137.5 |
| ROBB | 97 | 142.65 | 242.5 |
| ANTHON | 98 | 144.1 | 245.0 |

It is clear, therefore, that were the individual school percentages in the case now before the Court to be presented in evidence in the case of the hypothetical elementary system, this statistical evidence would probably be given much greater weight and be much more persuasive of ethnic isolation than in the case now before the Court.

14. Indeed, there is analogous misgiving of the Fifth Circuit on this point as evidenced by the following language from Judge Clark's dissent in Ross v. Eckels etc., et al., 434 F.2d 1140, 1149:

"It is rapidly becoming apparent that despite express disclaimers (See Singleton v. Jackson Municipal Separate School Dist., 426 F.2d 1364 (5th Cir. 1970) (Footnote 5), the special school case panels of this circuit are now out ahead of the requirement laid down by the Supreme Court and have adopted *sub silento* some unmentionable standard of numerical pupil racial balance to govern the affirmance or reversal of school case decisions (citing cases). For the good of the schools and pupils of this circuit, I for one do not understand why the 'magic figures' must remain a mystery enshrouded in nebulous phrasing that says that the plan adopted is 'ineffective' or 'unacceptable'.

"The true principle that underlies the reversal of the district court here is that the neighborhood school system ordered for Houston did not achieve that degree of racial balance some judges of this circuit have declared is 'enough'. We do nothing but delude ourselves when we adopt such a premise. Like chasing the pot of gold at the end of the rainbow, this reasoning embarks us on a course without end. Unless someone would be boldly foolish enough to assert that courts can deprive school district patrons of their freedom, then it follows as the night follows the day that the courts will never finish litigating such 'numbers game' cases."

ing of a discriminatory creation of a dual school system and likewise conflicting with the holding in *Keyes* which is now before the Supreme Court for decision.

I must conclude that *Cisneros* and *Austin,* supra, are apocryphal and not reliable authority. While the probity of these varied and conflicting concepts cannot be questioned, the accreting effect in this area of litigation is staggering.

Most Trial Judges are either nescient or callow at best in the management of scholastic institutions and temples of learning and are ill equipped to enter the maelstrom of educational supervision. Consequently, in the absence of a showing that the School Board's action is unreasonable and constitutes invidious discrimination of constitutional proportion against some group because of race or national origin, the management of a school system should be left to the knowledgeable direction of the democratically elected local School Board.

Apparently, in an effort to justify its amalgamation of the concepts of discrimination and ethnic isolation, the Fifth Circuit in *Cisneros* stated that discriminatory intent or motive on the part of the school system need not be shown, citing Wright v. Council of City of Emporia[15] as the Supreme Court authority supporting that conclusion. It is certainly true that the Supreme Court in the *Emporia* case, as has the Fifth Circuit in many cases, held that it is not necessary to show discriminatory intent on the part of a school district *in its formulation of a desegregation plan* in order to reject that plan in favor of one achieving greater desegregation. This is precisely the situation the Supreme Court had before it in the *Emporia* case; i. e., the evaluation of conflicting desegregation plans in districts which had admittedly operated de jure segregated dual school systems. However, the test of constitutionality should not be the same in scrutinizing the *establishment* of a segregated system as should be applied in evaluating the propriety of the method of *disestablishment* of an admittedly discriminatory school system. This distinction in the constitutional tests was clearly perceived by the Tenth Circuit in the *Keyes* case. In that portion of that opinion the Court dealt with the contention of the plaintiffs that they had no burden to prove discriminatory intent on the part of the Denver school authorities which resulted in racial isolation in some of the Denver schools. The Circuit Court first pointed out that the decisions relied upon by the plaintiffs on that issue all dealt with attempts to disestablish dual systems previously created by State law; in other words, in cases dealing with the most appropriate method by which to desegregate, as opposed to the question of whether or not there is any constitutional obligation on the part of the school authorities in a given system to desegregate in the first instance. The Court in the *Keyes* case clearly set forth this distinction with the following language:

"But that case (relied on by the plaintiffs) dealt with a school system which had previously operated under a state law requiring segregation of races in public education. As in all *disestablishment* cases where a former dual system attempts to *dismantle* its segregated schools, the burden was on the Tulsa School Board to show that they had undertaken to accomplish a unitary public school system. Such an onerous burden does not fall on school boards who *have not been proved to have acted with segregatory intent.* Cross-appellants' reliance on United States v. School District 151 of Cook County, Illinois, 286 F.Supp. 786 (N. D.Ill.1968), aff'd 404 F.2d 1125 (7th Cir. 1968) . . ., is misplaced for the same reasons set out above. In that case, the court was likewise dealing with a school district which was segregated by unlawful state action.

15. Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972).

"Where, as here, the system is not a dual one, and where no type of state imposed segregation has previously been established, the burden is on plaintiff to prove by a preponderance of the evidence *that the racial imbalance exists and that it was caused by intentional state action.*" (Emphasis added.) 445 F.2d 990 at 1006.

This Court certainly understands the Fifth Circuit's holding in *Austin* and *Cisneros* and agrees with it that discriminatory treatment of a particular ethnic group by a school district is a constitutional violation which the Court should remedy in its equitable power, regardless of whether the district had previously been segregated by State law. I do not, however, and cannot believe that where, in a situation, as here, there has been no de jure segregation by State law and no intentional discrimination on the part of the local school authorities directed at an ethnic group, the Constitution authorizes the Court to order the shifting of students and teachers in that school system merely because there exists, in fact, some ethnic numerical imbalance in some of the schools. [I cannot share the Orwellian proclivity of the majority of the Fifth Circuit who tend to exercise an over-zealous intrusion into the affairs of any school district which finds itself in some manner attacked by dissident parents, teachers, or students.]

If the Fifth Circuit did hold in *Cisneros*, as I believe it did, that discriminatory intent on the part of school authorities or some other arm of the State is irrelevant where racial isolation exists in a school system, then that holding conflicts with unequivocal statements to the contrary from several other Circuits (note 12, supra), and paradoxically is a proliferation and interpolation of the purpose and spirit of *Swann*. The most recent pronouncement contrary to that of the Fifth Circuit from another circuit is the holding in the *Keyes* case, supra. After a careful evaluation of the facts pertaining to all the schools in the Denver district, the Trial Court ordered desegregation of the entire District. The Tenth Circuit Court of Appeals affirmed this decision in part and reversed in part. Where the Trial Court concluded that certain schools were segregated as a result of the discriminatory intent of school officials, the Appellate Court upheld the District Judge and affirmed the desegregation ruling. However, the Tenth Circuit reversed that portion of the Trial Court's decision where desegregation was ordered for those schools evincing a high Negro student population and racial isolation, but absent evidence or a finding of intentional discrimination by school authorities. The Tenth Circuit in *Keyes*, supra, departed from what I believe the Fifth Circuit held in *Cisneros*, supra, with the following language:

"However, then, in the final analysis, the finding (of the trial court) that an unequal educational opportunity exists in the designated core schools *must rest squarely on the premise that Denver's neighborhood school policy is violative of the Fourteenth Amendment because it permits segregation in fact.* This undermines our holdings in the Tulsa, [United States v. Board of Education of Tulsa County, 429 F.2d 1253 (10th Cir. 1970)], Downs [Downs v. Board of Education of Kansas City, 336 F.2d 988 (10th Cir. 1964)] and Dowell [Board of Education of Oklahoma City Public Schools, Independent Dist. No. 89 v. Dowell, 375 F.2d 158 (10th Cir. 1967)] cases and cannot be accepted under the existing law of this Circuit."

\* \* \* \* \* \*

"Our reluctance to embark on such a course (requiring desegregation of schools where no discriminatory intent has been shown) stems not from a desire to ignore a very serious educational and social ill, *but from the firm conviction that we are without power to do so.* (Citing authority) Before the power of the federal courts may be invoked in this kind of case, *a constitutional deprivation must be shown.* Brown v. Board of Education, 347 U.

S. 483, 493–495, 74 S.Ct. 686, 98 L. Ed. 873 (1954) . . . held that when a state segregates children in public schools solely on the basis of race, the Fourteenth Amendment rights of the segregated children are violated. We never construed Brown to prohibit racially imbalanced schools *provided they are established on racially neutral criteria, and neither have other circuits considering the issue.* (Citing authority) Unable to locate a firm foundation upon which to build *a constitutional deprivation,* we are compelled to abstain from enforcing the trial judge's plan to desegregate and integrate the court designated core area schools." (Emphasis added.) 445 F.2d 990 at 1005.

The cases from other Circuits cited in the *Keyes* quotations above are the same as those cited at note 12, supra. In the first opinion in Deal v. Cincinnati Board of Education,[16] the Sixth Circuit squarely framed the issue thusly: "Was there a constitutional duty on the part of the Board to balance the races in the Cincinnati public schools where the imbalance was not caused by any act of discrimination on its part?" The Court went on to answer that question in the negative, holding: "When no discrimination is shown, racial imbalance alone is no warrant for relief."

## CONCLUSION

By granting the petition for certiorari in the *Keyes* case, the Supreme Court now, for the first time, has directly before it, for decisional opinion, this issue upon which the Court reserved judgment in the *Swann* opinion. Because this very issue may be determinative of the outcome of this case in view of my finding that the Uvalde school officials have not been guilty of any deliberate segregation of Mexican-American children or of discriminatory intent in dealing with them, and because I understand the Fifth Circuit's position on this issue to be squarely contrary to that of the other

Circuits which have considered the question, I believe the best course to follow is to withhold the issuance of a decree in this case pending the Supreme Court's decision in *Keyes*. This judicial restraint has been many times countenanced by the Fifth Circuit where an issue of this significance is soon to be ruled upon by the Supreme Court for the first time, and particularly where the Fifth Circuit has found its position to be contrary to those of other Circuits, and the issue is pending in the Supreme Court. In fact, in the *Austin* case itself, seven of the fourteen judges participating in the opinion voted to hold a decision on the merits in abeyance pending the Supreme Court's decision in the *Keyes* case. I find Judge Godbold's special opinion to be compelling. There he noted the pendency of the *Keyes* case with certiorari having been granted and the fact that to date the Supreme Court has not said "*what we should do about segregation springing from causes other than affirmative state action.*" I concur wholeheartedly in what Judge Godbold said in that special opinion as to the valid reasons to withhold the entry of a judgment in this case pending the opinion of the Supreme Court in *Keyes* and now stay my hand·as he and six other judges would have done in *Austin*. The very same thing was recently done by the Fifth Circuit in Stout v. Jefferson County Board of Education[17] decided after the *Austin* and *Cisneros* opinions. That case involved the issue of splinter school districts which had withdrawn, in accordance with State law, from larger districts seeking to disestablish the dual system. In the Fifth Circuit opinion in *Stout,* the Court explained that because the question of the validity of such splinter districts was fundamental to its decision, and because the Supreme Court had accepted certiorari in two Fourth Circuit cases "whose views on splinter districts were contrary to that of this Circuit", it had withheld its decision. The decision in *Stout* was issued by the Fifth Circuit only after the Supreme

16. Note 12, supra.

17. 466 F.2d 1213 (5th Cir., 1972).

Court's opinions were handed down in those cases.[18] This is the very same practice which I find to be most appropriate here.

Many of the social and political frustrations of the parties have boiled over into this litigation which has opened a Pandora's Box of human emotions, revealing the deep-seated and ofttimes vindictive sentiments of the participants. Mindful that no decision of mine can or will assuage the feelings of all of the advocates in this heated dispute, I feel most strongly that they deserve no less than a judgment based on the best available, authoritative precedent in the interest of the clarity and finality of this litigation.

Accordingly, no judgment or decree will be entered in this case until after I have the benefit of the Supreme Court's decision on the keystone issue in this case which appears to be squarely before it in *Keyes.*

*Supplemental Opinion*

The Court heretofore filed its Memorandum Opinion in this case on February 13, 1973. In that Opinion an apparent dichotomy in the recent decisions of the Supreme Court and the Fifth Circuit Court of Appeals was discussed at length. It was then anticipated that the United States Supreme Court would shed a definitive light on the pertinent legal issues confronting this Court in the case at Bar and hopefully resolve the existing dilemma through their decision of Keyes et al. v. School District No. 1, Denver, Colorado et al., 413 F.2d 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). The Court has now had the benefit of the *Keyes* Opinion and through this Order enters its Final Judgment in the above styled and numbered cause.

As extensive factual findings were fully detailed in the Memorandum Opinion, they need not be reiterated here. Suffice it to say that there was no com-

pelling evidence of intentional segregation, no denial of equal educational opportunity, nor of intentional discrimination with respect to the policies and practices of the School District as regards Mexican-American students or faculty and the Court so found on pages 818, 819, 820, 821, 824, and 825 of its Opinion.

Justice Brennan, writing for the Supreme Court in *Keyes,* supra, stated:

"We emphasize that the differentiating factor between *de jure* segregation and so-called *de facto* segregation to which we referred in *Swann* is *purpose* or *intent* to segregate."

The Court went on to define de jure segregation as "a current condition of segregation resulting from intentional state action directed specifically to the . . . schools." Any doubt that the *de jure/de facto* distinction has not been abandoned by the Supreme Court or that de jure segregation requires intent is further laid to rest in the dissenting and specially concurring opinions of Justices Douglas and Powell. Justice Powell on page 230, 93 S.Ct. on page 2708 of his dissent clearly states:

"The Court today does move for the first time toward breaking down past sectional disparities, but it clings tenuously to its distinction. It searches for *de jure* action in what the Denver School Board has done or failed to do, and even here the Court does not rely upon the results or effects of the Board's conduct but feels compelled to find segregatory intent."

Justice Douglas also writes:

". . . I agree with my Brother Powell that there is, for the purposes of the Equal Protection Clause of the Fourteenth Amendment as applied to school cases, no difference between *de facto* and *de jure* segregation."

Both Justices address themselves specifically to the *Cisneros* [1] and *Texas Educa-*

---

18. Wright v. Council of City of Emporia, note 15, supra, and United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972).

1. Cisneros v. Corpus Christi Independent School District, 467 F.2d 142 (5th Cir., 1972).

*tion Agency*[2] opinions by the Fifth Circuit Court of Appeals and would have the majority adopt the Fifth Circuit viewpoint eradicating the *de facto/de jure* distinction as well as the required element of intentional segregation in *de jure* cases. The majority of the Supreme Court has clearly declined to accept this rationale.

I am in complete accord with the recent Opinion by Chief Judge Adrian A. Spears of this District in Zamora et al. v. New Braunfels Independent School District et al., 362 F.Supp. 552 (W.D., Tex.1973) in which he states:

> "It is, therefore, the conclusion of this Court that the *Cisneros* approach has not been approved by the Supreme Court, and that, consequently, the only segregation that the Courts are permitted to remedy is *de jure* segregation."

This Court has previously found that any State action directed specifically to the Uvalde School District resulting in segregation was neither purposeful nor intentional. In light of this finding of no *de jure* segregation within the School District, the Court further finds that any existing segregation is purely *de facto* and wholly the result of neighborhood residential patterns.

The elementary attendance zone lines presently in force in the District have not in any manner served to substantiate a charge of intentional segregation. Rather, the only evidence as to the District's motivation in drawing zones was to preserve the integrity of the neighborhood school concept with the advice and consent of the bi-ethnic Citizen's Committee in Uvalde. (See pp. 816, 817 of this Court's Memorandum Opinion.) The Supreme Court addressed this issue specifically in *Keyes,* supra:

> "We have no occasion to consider in this case whether a 'neighborhood school policy' of itself will justify racial or ethnic concentrations in the absence of a finding that school authorities have committed acts constituting *de jure* segregation."

Furthermore, Justice Douglas in *Keyes* admits that the continuation of a "neighborhood" school policy at the elementary level by a School Board is still classified as *de facto* segregation although he steadfastly maintains that such a classification amounts to a distinction without a difference. Until a majority of the Supreme Court adopts Justice Douglas' argument, such a policy remains *de facto* or at least justifiable absent a finding of *de jure* segregation such as in the case at Bar.

As regards neighborhood schools, it is important to note the comments made by Justice Powell in *Keyes,* supra:

> "I do not imply that the neighborhood concept must be embodied in every school system. But where a school board has chosen it, federal judges should accord it respect in framing remedial decrees."
>
> \* \* \* \* \* \*
>
> " . . . To send young children day after day to distant schools seems out of the question.' A community may well conclude that the portion of a child's day spent on a bus might be used more creatively in a classroom, playground, or some other extracurricular school activity. Decisions such as these, affecting the quality of a child's daily life, should not lightly be held constitutionally errant."
>
> \* \* \* \* \* \*
>
> " . . . As a minimum, this Court should not require school boards to engage in the unnecessary transportation away from their neighborhoods of elementary age children. It is at this age level that neighborhood education performs its most vital educational role. It is with respect to children of tender years that the greatest concern exists for their physical and psychological health. It is also here, at the elementary school that the rights of parents and children are most sharply implicated."

2. United States v. Texas Education Agency, 467 F.2d 848 (5th Cir. 1972).

Having thus considered the facts previously found by the Court on February 13, 1973 as they relate and apply to the decision of the United States Supreme Court in *Keyes*, supra, it is accordingly ordered, adjudged and decreed that all relief sought by the plaintiffs should be, and the same is hereby, in all things denied.

The Findings of Fact and Conclusions of Law contained in the Court's Memorandum Opinion in this case and this Order shall constitute the Court's compliance with Rule 52, Federal Rules of Civil Procedure.